## REGENTS OF THE STATE UNIVERSITY v. TRAPP, *Auditor.*

No. 1791.   Opinion Filed January 24, 1911.

1.   **STATUTES—Appropriations—Veto of Items by Governor.** Section 12, art. 6, Constitution, providing that the Governor may disapprove any item of a bill making appropriations of money embracing distinct items, does not apply to a special appropriation bill containing only one item of appropriation for the support and maintenance of the State University; and the act of the Governor approving the bill in part and disapproving other parts thereof, directing how the funds appropriated shall be apportioned, is a nullity.

2.   **STATUTES—Approval of Governor—Necessity.** Senate Bill No. 268 (Session Laws of Okla. 1909, p. 73) having been presented to the Governor less than five days before the adjournment of the Legislature by which it was enacted, and not having been approved by the Governor within fifteen days after the adjournment of said Legislature, never became a law.

(Syllabus by the Court.)

*Original Petition for Writ of Mandamus.*

Mandamus by the Regents of the State University of Oklahoma against M. E. Trapp, State Auditor.   Writ denied.

*Ben F. Williams* and *Fulton & Pitman,* for plaintiffs.

HAYES, J.· This is an original proceeding in this court by plaintiffs, the regents of the State University, to compel by mandamus defendant, the State Auditor, to issue to the treasurer of the

board of regents a warrant on the State Treasurer for the sum of $2,235.70 upon a list of certified and approved claims aggregating that amount. The facts surrounding the claims for which the warrant is sought are that various persons have rendered labor or service or furnished-merchandise to the State University and their respective claims therefor have been allowed by the board of regents. The aggregate amount of these claims is the sum of $2,-235.70, for which aggregate amount an account in favor of the local treasurer of the board of regents has been approved by the State Board of Public Affairs for the purpose of enabling the treasurer of the board of regents to obtain a warrant for said aggregate amount of claims; the proceeds from said warrant to be distributed by him in the payment of said claims.

Although notice was given to defendant of the hearing upon this application, no pleading of any kind has been filed by him, nor has any brief been filed in his behalf. It is, however, the duty of the court to search the petition to ascertain whether it states facts sufficient to entitle plaintiffs to the relief sought.

It appears from the petition that the State Auditor refuses to issue the warrant for the reason, as he contends, that there are not sufficient funds appropriated to pay same. Whether there are funds appropriated, now unexpended, which may be used in the payment of the claims involved in this proceeding, depends upon the construction of the provisions of an act of the Legislature purported to have been approved by the Governor in part on March 27, 1909, and upon the effect of the Governor's attempted approval in part and disapproval in part of said act. It is the contention of plaintiffs: First, that by the second section of that act, $343,493.05 is appropriated to defray the expenses of the State University for the years 1909-10 and 1910-11; and, second, if they be in error as to this, that by the first section, there is appropriated $285,810.23 for said purposes; and that, in either event, there is a sufficient amount of the sum appropriated by said act now unexpended to pay the claims which form the basis of this action. It appears from the petition that the State Auditor contends, on the other hand, that the bill,

as adopted by the Legislature, appropriated only $285,810.23, and that $94,800 of said amount was disapproved by the Governor, leaving a total appropriation in the sum of $191,010.23. It appears that when the Governor came to consider whether he should approve or disapprove this act, he was of the opinion that it fell within the provisions of section 12, art. 6 of the Constitution; and that he was authorized thereby not only to approve or disapprove any item *in tolo*, but to reduce any item or items to a smaller sum than approved by the Legislature, and after such reduction, approve the item. But, under our view of the legal effect of the 'Governor's acts, it is not necessary to determine whether said section 12, art. 6 of the Constitution confers upon the Governor power to approve a part of an item of a bill and disapprove the remainder at the same time.

We believe that the questions presented by this proceeding and a consideration thereof will be made more intelligible and effectual by setting out in full the act of the Legislature involved, which is as follows:

"Section 1. There is hereby appropriated out of the state treasury the sum of two hundred eighty-five thousand, eight hundred ten and twenty-three hundredths dollars, or so much thereof as may be necessary, for the support and maintenance of the State University at Norman for the biennial period, beginning July 1, 1909, and ending June 30, 1911; and for other and miscellaneous purposes, and the State Auditor shall draw warrants upon the State Treasurer for such portion thereof as may be found to be due upon auditing the respective claims in favor of the person or persons to whom such claims are allowed; provided, that all claims and accounts against the state shall be sworn to as true and correct accounts before being audited.

"Section 2. The appropriation for the State University at Norman shall be apportioned as follows:

| Salary. | 1909-10 | 1910-11. |
|---|---|---|
| President | $ 4,000.00 | $ 4,000.00 |
| 34 professors, including librarian, registrar and purchasing agent, drawing from $1,500 to $2,500 | 55,750.00 | |
| 38 professors, including registrar, librarian and purchasing agent, drawing from $1,500 to $2,500 | | 61,325.00 |
| 14 associate professors, including secretary, drawing from $1,250 to $1,500 | 19,250.00 | |
| 15 associate professors, including secretary, drawing from $1,250 to $1,500 | | 20,400.00 |

Regents of the State University v. Trapp, Auditor.

| | | |
|---|---|---|
| 4 assistant professors, from $1,000 to $1,350 | 4.700.00 | |
| 5 assistant professors, from $1,000 to $1,350 | | 6,000.00 |
| 15 instructors from $800 to $1,000 | 13.500.00 | |
| 18 instructors from $800 to $1,000 | | 16,200.00 |
| Student helpers | 5,925.00 | 6,525.00 |
| Total for each year | $103,125.00 | $114,450.00 |
| Total for biennial period ending June 30, 1911 | | $217.575.00 |

Current Expenses.

| | | |
|---|---|---|
| For printing | $ 1,500.00 | $ 1,500.00 |
| For freight, drayage and express | 3,000.00 | 3,250.00 |
| For advertising | 2,500.00 | 3,000.00 |
| For postage | 1.500.00 | 1,750.00 |
| For fuel and maintenance of power plant.. | 3,000.00 | 3,250.00 |
| For rent | 1,000.00 | 1,500.00 |
| For necessary repairs to build'ngs and maintenance of grounds | 3,500.00 | 4,750.00 |
| For traveling expenses | 1,800.00 | 2,000.00 |
| For insurance on new building | 1.000.00 | 1,000.00 |
| Total for each year | $ 18,800.00 | $ 22,000.00 |
| Total for biennial period ending June 30, 1911 | | $ 40.800.00 |

| Departments. | 1909-10 | 1910-11. |
|---|---|---|
| For apparatus and supplies for departments of botany, bacteriology. histology, pathology, zoology, pharmacy engineering, physiology. chemistry, medicine, geology, meteorology, psychology and physical training | $ 25.775.00 | $ 18,031.55 |
| For maps, charts and models and instruments for departments of history, psychology, Greek and physiology | 1,100.00 | 1,100.00 |
| For books, periodicals for University and departmental libraries | 5,400.00 | 6.141.50 |
| For dean of women, work with girls and developing this department | 650.00 | 650.00 |
| For apparatus, chemicals and assistants for the state pure food and public health laboratories and work | 2,650.00 | 4,100.00 |
| Total for each year | $ 35,575.00 | $ 30,023.05 |
| Total for biennial period ending June 30. 1911 | | $ 65,598.05 |

Administrative Offices.

For furniture and equipment for the offices, reception rooms and parlors in the new building................................... $ 2,750.00    $ 600.00

For office supplies, typewriters, etc............. 1,470.00    1,200.00

     Total for each year...................................... $ 4,220.00    $ 1,800.00

     Total for biennial period ending June 30, 1911 ............................................................    $ 6.020.00

Total for summer school................................. $ 5,000.00    $ 5,000.00

Total for biennial period ending June 30, 1911 ........................................................................    $ 10,000.00

Total incidentals ........................................... $ 1.000.00    $ 2,500.00

Total for biennial period ending June 30, 1911 ........................................................................    $ 3,500.00

     Grand total ............................................... $167,720.00    $175,773.05

               $343,493.05

Less the following amounts:

Special levies appropriated in Senate Bill 358 ................................................. $ 14.219.32

Sec. 13 money appropriated by House Bill 336 ................................................. $ 43,463.50    $ 57,682.82

          $ 57,682.82    $285.810.23

"March 27th, 1909, approved except—

"As to item Sec. 2—$55,750 reduced to $48.450, and $61,325 reduced to $54,025.

"Also as to item Sec. 2—$19,250 reduced to $14,250, and $20,400 reduced to $15,400.

"Also as to item Sec. 2—$4.700 reduced to $4,000, and $6,000 reduced to $5,300.

"Also as to item Sec. 2—$13,500 reduced to $5,500, and $16,200 reduced to $8,200.

"Also as to item Sec. 2—$5,925 reduced to $1.925, and $6,525 reduced to $2,525.

"Also as to item Sec. 2—$3,000 reduced to $1,000 and $3,250 reduced to $1,250.

"Also as to item Sec. 2—$2,500 reduced to $500 and $3.000 reduced to $1,000.

"Also as to item Sec. 2—$1,500 reduced to $500 and $1,750 reduced to $750.

"Also as to item Sec. 2—$3,500 reduced to $2,500, and $4.750 reduced to $3,750.

"Also as to item Sec. 2—$1,800 reduced to $800, and $2,000 reduced to $1.000.

"Also as to item Sec. 2—$25,775 reduced to $20,775, and $18,031.55
reduced to $13,031.55.

"Also as to item 'Sec. 2—$5,400 reduced to $2.400, and $6,141.50
reduced to $3,141.50.

"Also as to item Sec. 2—$2,650 reduced to $1,650, and $4,100
reduced to $3.100.

"Also as to item Sec. 2—$2,750 reduced to $1,250, and $600 reduced to $300.

"Also as to item Sec. 2—$1,470 reduced to $970 and $1,200 reduced to $700.

"Also as to item Sec. 2—Summer School $5,000 all disapproved
for year both fiscal years, and after said reductions have been
made the items as reduced and all other items approved
and this act is approved.
                                       "C. N. HASKELL. Gov."

It will be observed that section 1 appropriates the sum of
$285,810.23 for the support and maintenance of the State University for the period mentioned therein. This, in our opinion,
is the first and only item of appropriation contained in the act.
It appears, however, that the Governor construed the second section as making items of appropriation; and that he has attempted
to disapprove in part certain of the items contained therein. But
that this section will not bear that construction, we think is perceivable from the first clause of the section, as well as from a consideration of the entire section. The first clause of the second
section does not state that an appropriation or appropriations are
made, but that "the appropriation for the State University at
Norman shall be apportioned as follows." The aggregate amount
apportioned by said section is $343,493.05, which exceeds the
amount appropriated by section 1; but at the close of the second
section there occurs the following language: "Less the following
amounts: Special levies appropriated in Senate Bill No. 358,
$14,392.32. Section 13, money appropriated by House Bill 336,
$43,463.50. Total 57,682.82." A reference to Senate Bill 358 and
House Bill 336 aids us to understand what was intended by section 2 of the act under consideration. House Bill 336 directs
how the funds derived from the rentals on section 13 granted by
the Enabling Act to the state, for the benefit of the State University, for the Agricultural and Mechanical College, the Normals, the

University Preparatory School and the Colored Agricultural and Normal University, shall be divided and distributed among said institutions; and provides that the State University shall receive annually five-eighths of one-third of the funds derived from that source. Section 3 of that act appropriates the funds then on hand collected from the interest and rentals of section 13 and apportions as the amount to which the State University was entitled that year for its support and maintenance, the sum of $21,731.25. It appears that the Legislature had in contemplation that, under the provisions of that act, a like sum would be available each year from the same source for the support and maintenance of the State University, which, for the biennial period covered by Senate Bill No. 268, would be the sum of $43,462.50.

Senate Bill No. 358, approved by the Governor March 24, 1909 (Session Laws 1909, p. 84), appropriates to the University the surplus funds derived from territorial levies made in the years 1903-4-5-6-7 and 8, the sum of $14,219.32. But neither house Bill 336 nor Senate Bill 358 attempts to direct how the funds therein appropriated to the University shall be distributed in their expenditure in the support and maintenance of that institution. This was what was attempted to be done by section 2 of Senate Bill No. 268. That section distributed and directed how the amounts appropriated, not only by section 1 of the Senate Bill 268, but also by the two former acts, to wit, Senate Bill 358 and House Bill 336, shall be expended.

By section 11, art. 6 of the Constitution (Snyder's Const. of Okla., p. 194), it is provided:

"Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with

the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote in both houses shall be determined by yeas and nays, the names of the members voting shall be entered on the Journal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment."

The foregoing provision of the Constitution grants to the Governor the legislative power of the veto. By reason of that section, no bill which is sent to the Governor less than five days before the adjournment of the Legislature can become a law without the approval of the Governor, unless passed over his veto; and it cannot become a law with his approval, unless approved by him within fifteen days after such adjournment. By the veto power, conferred upon the Governor by this section, he is authorized to approve or disapprove an act only *in toto*. He may not approve a part and disapprove a part; but section 12, art. 6 of the Constitution provides for an exception, in that by it power is conferred upon the Governor to approve some items of certain bills and disapprove others. That section reads as follows:

"Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapprove the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated; but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills:

*Provided,* That this section shall not relieve emergency bills of the requirement of the three-fourths vote."

The meaning of the foregoing section is not obscure, and the object it was intended to accomplish is apparent. Without that provision, all bills of whatever character could be approved or disapproved by the Governor only in their entirety. But by section 57, art. 5, general appropriation bills may embrace more than one subject; and if the veto power were confined to the whole bill, the Governor might often be required to destroy much good legislation in order to defeat one item of a bill that was bad, or, on the other hand, be compelled to approve a piece of legislation vicious in part, in order to obtain the benefits of the salutary provisions of the same act. It was to enable the Governor to approach in a measure the consideration and approval of a bill carrying items of appropriation with the same power that the members of the legislative departments are authorized to act upon it, in that he may consider and approve some of the items separately ·without being required to approve them all. But this power is conferred upon him only as to bills that make appropriations of money "embracing distinct items," and it was contemplated that it should apply only to those bills where more than one item of appropriation was made. Whether the power to approve some of the distinct items of an appropriation bill and to disapprove others carries with it the power to reduce any item to a sum less than provided in the act and then approve it, as seems to have been the opinion of the Governor, is not here necessary to determine; for, upon the more serious reason that the act under consideration does not fall within the class of acts embraced in section 12, art. 6, the Governor was without power to approve the bill in part and disapprove it in part.

In *State v. Holder,* 16 Miss. 158, a very similar constitutional provision was considered as applied to an act somewhat similar to the act under consideration in the instant case. The act in that case, by one of its sections, appropriated certain sums of money for the support and maintenance of the Industrial Institute

and College of Mississippi. Other sections of the act provided how drafts on said fund should be drawn and approved, and upon what conditions the money appropriated should become available. The fund appropriated by the act for wages and salaries was not to become available, unless the Board of Trustees first adopted and enacted rules and by-laws: First, conferring upon the president of the institution certain powers; and, second, providing for equal dormitory privilege to all pupils. The Governor approved the portion of the act making the appropriation and certain portions of the act prescribing the conditions upon which it should become available, but disapproved that portion which required the conferring upon the president of the college certain powers. The constitutional provision governing in that case was as follows:

"Sec. 73. The Governor may veto parts of any appropriation bill and approve parts of the same, and the portions approved shall be law."

The court, in construing this provision and holding that it did not apply to the act under consideration in that case, said:

"The true meaning of section 73 is that an appropriation bill made of several parts—that is, distinct appropriations, different, separable, each complete without the others, which may be taken from the bill without affecting the others, which may be separated into different parts complete in themselves—maybe approved and become law in accordance with the legislative will, while others of like character may be disapproved and put before the Legislature again, dissociated from the other appropriations. To allow a single bill, entire, inseparable, relating to one thing, containing several provisions, all complementary of each other and constituting one whole, to be picked to pieces and some of the pieces approved and others vetoed, is to divide the indivisible, to make one of several, to distort and pervert legislative action, and, by veto, make a two-thirds vote necessary to preserve what a majority passed allowable as to the entire bill, but inapplicable to a unit composed of divers complementary parts, the whole passed because of each."

The bill in the case at bar does not embrace distinct items of appropriation; it embraces a single item, with direction how that

item shall be expended, together with directions as to how other items of appropriation made by other acts of the Legislature shall be apportioned and expended. The Governor's power to approve or disapprove same, therefore, is not derived from section 12, art. 6 of the Constitution, but from section 11, *supra*. Under that section, since the bill was presented to the Governor less than five days before the adjournment of the Legislature, approval of the whole bill by him was necessary within fifteen days atfer its adjournment, in order for it to become a law. This he never did. He attempted to approve the bill in part and disapprove it in part. But, since he was without authority thus to approve the bill, his sanction of parts of the bill was ineffectual to give those parts the force of a law. Whether, if the Governor had understood his powers relative to the bill differently he would have approved the whole bill, including those items disapproved by him because in his judgment they were excessive, can only be conjectured. What he did do is a matter of record. He did not approve the entire bill, but specifically disapproved portions of it.

It follows that the bill never became a law; and that the State Auditor is without authority and under no duty to draw warrants upon the funds purported to be appropriated thereby. The relief sought by plaintiffs is denied.

All the Justices concur.