582 P.2d 1082

Pete T. CENARRUSA, Secretary of State of the State of Idaho, Plaintiff-Respondent,

v.

Cecil D. ANDRUS, Governor of the State of Idaho, Defendant-Appellant.

No. 12364.

Supreme Court of Idaho.

July 19, 1978.

Robert E. Smylie, Boise, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., Peter E. Heiser, Jr., Chief Deputy Atty. Gen., Boise, for plaintiff-respondent.

BISTLINE, Justice.

## I.

This appeal involves questions of a governor's vetoes of two bills passed by the Idaho Legislature in 1976 and forwarded to the Governor for his consideration only after the close of the legislative session. The precise question applicable to both bills is whether the Governor's vetoes were ineffective because not within the time limitation placed upon his veto power by Article 4, § 10, *Idaho Constitution*, the relevant portions of which are:

§ 10. VETO POWER.—Every bill passed by the legislature shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it with his objections to the house in which it originated, which house shall enter the objections at large upon its journals and proceed to reconsider the bill. . . . Any bill which shall not be returned by the governor to the legislature within five days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it, *unless the legislature shall, by adjournment, prevent its return, in which case it shall be filed, with his objections, in the office of the secretary of state within ten days after such adjournment (Sundays excepted) or become law.* (Emphasis supplied.)

The second regular session of the 43d Idaho Legislature adjourned *sine die* at 11:30 p. m. on March 19, 1976. Eighty-five bills were presented to the Governor *after* adjournment. Joint Rule 5 of the Senate and House of Representatives provides in part that, "All bills shall be so signed and delivered to the governor for his consideration within 72 hours after final passage." The last bills, including the ones in contro-

versy, were presented to the Governor on March 23, 1976, within the 72 hours provided by the rule. Ten (10) days (Sundays excepted) from the date of adjournment would have expired at midnight on Wednesday the 31st of March.

On April 1, prior to 3:10 p. m., the Attorney General delivered a letter to the Secretary of State, plaintiff herein, informing him that ten days since adjournment having expired, the Governor "no longer had the authority to exercise veto power over bills acted upon prior to the 1st day of April, 1976, all such bills automatically becoming law by the passage of time . . . ." That same day, the Governor purported to veto Senate Bill 1428 and to veto in part Senate Bill 1494, delivering the same to the Secretary of State's office at 3:10 p. m. The Secretary of State, refusing to recognize any veto right in the Governor, designated and assigned appropriate chapter numbers to each, following which he so informed the Governor by letter of April 2, 1976.

To resolve the controversy, the Secretary of State initiated this declaratory judgment action, naming the Governor as defendant. Opposing motions for summary judgment were filed and argument was heard thereon. Summary judgment was granted to the Secretary of State. The district court held that, since it was the obvious intent of the constitutional drafters to allow five days after presentment for consideration by the governor during the session, *at least* five days *after presentment* are required for consideration of a bill presented after the legislature has adjourned, even though in some cases the ten days after adjournment provision will be violated. In other words, a governor would have either ten days after adjournment or five days after presentment, *whichever was longer,* for consideration of a bill presented in the closing hours of the session or at any time thereafter. Since Governor Andrus had had the bills in question for five days after presentment when the ten days after adjournment expired, the attempted vetoes were held to have been ineffective and the bills adjudged to have become law under

Article 4, § 10, Idaho Constitution, and I.C. § 67–505. Both parties on appeal challenge the correctness of the district court's holding.

 The Governor argues that in order to preserve to his office the full ten days provided for his consideration of a bill presented following adjournment *sine die,* the ten days should begin to run only from the date upon which a bill is presented to the governor. The Secretary of State urges to the contrary that:

> A governor is entitled to have a bill "presented" to him, but unless the state's constitution clearly spells out the number of days after presentment within which the governor can act on a bill a governor is not entitled to any fixed period of time after presentment for his deliberation. . . . After adjournment the government must act within ten days (Sundays excepted) *regardless of the number of days he has had a bill after its presentment to him.*

The key issue, then, is whether presentment is required before the governor's time for consideration of a bill begins to run and if so whether the minimum number of days following presentment is to be five or ten. In other words, does this section allow a governor a certain minimum number of days for consideration of bills presented to him within the last five days of the legislative session or after adjournment, or does it establish an absolute deadline of ten days after adjournment for the filing of vetoed bills with the secretary of state.

The Idaho Constitution mandates that every bill passed by the legislature be presented to the governor before it becomes a law, Article 4, § 10. The governor, upon receipt of a bill passed by the legislature has three options: he may sign the bill if he approves it; he may allow it to become law without his signature; or, he may veto it by returning it with his objections to the house in which it originated. Article 4, § 10 has been considered by this Court in three prior cases, in each of which it was held that no bill or portion thereof can become a law

without presentment. *Worthen v. State*, 96 Idaho 175, 525 P.2d 957 (1974); *State ex rel. Brassey v. Hanson*, 81 Idaho 403, 342 P.2d 706 (1959); *Katerndahl v. Daugherty*, 30 Idaho 356, 164 P. 1017 (1917).

The *Hanson* case illustrates that it is the substance of the presentment requirement, not merely the formal act, which is of constitutional importance. In that case the rate in a tax bill was lowered by amendment before final passage in the house. "Through oversight or error in enrolling, the house amendment was omitted, and the enrolled bill was signed by the president of the senate and the speaker of the house, and was approved by the governor, *in form without the house amendment*." *Hanson*, 81 Idaho at 407, 342 P.2d at 707 (emphasis added). However, certain official documents showed that the governor had approved the bill as passed by the legislature with the rate-lowering amendment. The Court in distinguishing the *Katerndahl* case focused on the substance of the governor's act of approval:

It is these records of the governor's official action which distinguishes this case from *Katerndahl v. Daugherty*, supra. In that case there was nothing to show that the governor did not approve the bill as enrolled. In this case the record conclusively shows that all three of the divisions of legislative power—the house, the senate, and the governor—approved the house amendment and made it a part of the act.

*Id.* at 415, 342 P.2d at 713. The Court held that the bill as amended had become a valid law.

The governor's consideration of a bill is an essential element of the legislative process. *Id.* at 411, 342 P.2d at 711. Presentment provides an opportunity for the governor to give full consideration to a bill as finally passed by the legislature. The wise exercise of the executive right of veto necessarily requires thoughtful deliberation, which in turn requires time commensurate with the responsibility.

In *Edwards v. United States*, 286 U.S. 482, 52 S.Ct. 627, 76 L.Ed. 1239 (1932), the United States Supreme Court considered the question whether Congress could by adjournment cut off the right of the President to approve a bill which had been presented to him less than ten days prior to adjournment but which he had not yet signed when adjournment occurred. It was there held that the President could sign a bill within ten days after it had been presented to him, irrespective of the adjournment of Congress. Pertinent to the requirement of adequate time for consideration after presentment the Court said:

Regard must be had to the fundamental purpose of the constitutional provision to provide appropriate opportunity for the President to consider the bills presented to him. The importance of maintaining that opportunity unimpaired increases as bills multiply. The Attorney General calls attention to the fact that at the time here in question, that is, between February 28, 1931, and noon of March 4, 1931, 269 bills were presented to the President for his consideration, 184 of which were presented to him during the last twenty-four hours of the session. No possible reason, either suggested by constitutional theory or based upon supposed policy, appears for a construction of the Constitution which would cut down the opportunity of the President to examine and approve bills merely because the Congress has adjourned. No public interest would be conserved by the requirement of hurried and inconsiderate examination of bills in the closing hours of a session, with the result that bills may be approved which on further consideration would be disapproved or may fail although on such examination they might be found to deserve approval.

*Id.* at 493, 52 S.Ct. at 631.

We full well realize that the Idaho constitutional provision, which requires an active veto to prevent a bill from becoming law after the legislature has adjourned, is quite different in operation from the federal "pocket veto" provision. We nevertheless declare that the same fundamental purpose underlies the requirement of presentment

found in both constitutions. In this case the choice is between a construction of our constitutional language which would provide a definite amount of time for gubernatorial consideration of bills and one which would have the effect of allowing the legislature to determine the amount of time allowed to a governor, severely limiting it if the legislature so chose. The reasoning of the Supreme Court in *Edwards* is readily applicable here.

Counsels' research has produced only one reported case from the 49 other states which is at all similar to the one at bar, *State ex rel. Petersen v. Hughes*, 372 Ill. 602, 25 N.E.2d 75 (1939). The challenge there was to the Illinois governor's veto [1] of two bills, one of which had been presented to him on July 11 and the other on July 17, the legislature having adjourned *sine die* on June 30. The tenth day following adjournment, Sundays excepted, was July 12, One bill, with the governor's veto message, was filed in the office of the secretary of state on July 20 and the other on July 26. The argument was made that the ten day after adjournment language should be given absolute effect. The counter-argument was that, as to all bills not presented to the governor before adjournment, the governor was entitled to a ten-day period computed from the date of presentment in which to examine a bill and exercise his veto power. The Illinois Supreme Court said of the fundamental policy underlying the veto power:

> The purpose of granting the Chief Executive authority to approve or disapprove legislative matters was to enable him to prevent, as far as possible, the evils that flow from hasty and ill-considered legislation. The provision was one of the constitutional checks and balances exercised by one department of government over the other. It is a basic part of our scheme of government and is jealously guarded by the courts.

*Id.* at 78. The Illinois court also considered the legislature's right to present a bill to the governor after adjournment *sine die*, and upholding such right, the court held that the Illinois constitution must be construed to allow the governor a full ten days for consideration of bills presented after adjournment *sine die* :

> The constitutional provision granting the Governor ten days within which to approve or disapprove a bill and file the same if vetoed, must, as to all bills coming in the fourth class [those presented after adjournment], be the ten days following presentment . . . It can not be given an interpretation which will impair, or abridge, the time within which the Governor may exercise his veto power. If the provision in reference to filing in the office of the Secretary of State within ten days after adjournment was to control, then we are forced to the adoption of one of two impossible constructions. One would impair the legislative power to fix the time of presentment, the other would lessen the period of time for the Governor's consideration of the matter, and, in House Bill No. 537, remove it entirely.
>
> . . . With such a vast number of bills presented to the Governor for his consideration, it is apparent that practical necessity requires that he be given time for his examination. Any construction which reduces the ten-day period belonging to the Governor or imposes a duty upon the General Assembly to present all bills before the date of adjournment, would lead to the defeat of the benefits which the constitutional provision was intended to guarantee.

*Id.* at 80.

The Secretary of State argues that the result in *Hughes* followed from the Illinois

---

1. The applicable provision was section 16 of Article 5 of the Illinois Constitution of 1870, which, so far as relevant, provided:

 Any bill which shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it; unless the general assembly shall, by their adjournment, prevent its return, in which case it shall be filed with his objections in the office of the secretary of state, within ten days after such adjournment, or become a law.

constitutional time limitations of ten days both before and after adjournment, arguing that the Illinois Court misunderstood the nature of the constitutional amendment. However, we find no such fault in the reasoning of the Illinois court.

Other than the teaching of *Edwards* and the holding of the *Hughes* case, there is little else to guide us in our interpretation of article 4, § 10, of our Idaho Constitution. The Secretary of State argues that the language of the section is clear and beyond dispute, thus requiring a construction that the ten-day limitation is absolute. We do not see that the language is all that clear. The executive's part in the metamorphosis of a "bill" into law begins only when, after passage of the bill by the legislature, it has been presented to the governor. He can sign it, and it becomes law. He can leave it unattended for five days, the legislature being in session, and it becomes law. But if he does not approve, the legislature being in session, he can return it with his objections. The act of returning it with his objections is the veto of the bill. Nowhere in the Constitution is the governor required to endorse the bill as "vetoed."

Our main concern here begins with the language: "unless the legislature shall, by adjournment, *prevent its return.*" The word "return" assumes delivery or presentment to the Governor—he can not return that which he has not received. The constitutional language is best read on the presumption that the drafters contemplated that every bill would be presented to the governor before the legislative body adjourned.[2] Only under that construction would the governor always have a full ten days to give due and deliberate consideration to the rush of bills which invariably arrive on his desk during and immediately after the closing hours of the session.

There is no provision in our Constitution governing the time within which the legislature must present bills to the governor, and it is not for this Court to impose any limitation as to time. The legislature has set for its guidance the time within which, after passage, bills should be presented to the governor. Our Constitution itself contains nothing which precludes presentation of bills more than ten days after adjournment *sine die.* If we were to hold that the governor was without power to veto a bill more than ten days after adjournment, the legislature would be in a position to defeat at will one of the constitutionally granted powers of a separate and coequal branch of government merely by delaying presentment beyond the time in which the governor could act. A construction of the Constitution which defeats the very purpose of allowing the governor an opportunity to consider the wisdom of a bill is to be avoided.

Furthermore, a construction placing the legislature in control of the time frame available to a governor for consideration of a bill can only lead to an undermining of the dignity of the position to which each of these two equal and coordinate branches of government are entitled in their transactions with each other. While we agree with the district court that it is better for the governor to have a time certain for the performance of his important duties, we do not agree with the trial court's interpolation of the five-day period for return of a bill during the legislative session into the clause dealing with return of a bill following adjournment *sine die.* The proceedings of the constitutional convention show that that body evidently saw no large issue in a section providing two different time limits. Section 10, as brought before the convention, contained a provision for allowing the governor ten days in which to act *during* the session. The following proceedings took place:

Section 10 was read.

---

2. Whether completion of presentment of bills prior to adjournment was in fact contemplated we can not say. While the parties have provided us with the dates of the last gubernatorial action on bills for each session of the Idaho Legislature, they have not provided us with the date on which the last bill arrived on the governor's desk following the close of each session. We do not rest our decision on speculation as to what might have been in the contemplation of the drafters.

MR. MAYHEW. Mr. Chairman, I was going to suggest an amendment to this section. The words "ten days" should be changed to "five days," because ten days is one-sixth of the session of the legislature.

MR. AINSLIE. We have no objection on the part of the committee.

MR. MAYHEW. Then if there is no objection in the convention I move that it be changed from ten days to five days.

MR. AINSLIE. Where you have short sessions of the legislature I think five days is long enough myself.

The CHAIR. If there is no objection the secretary will substitute the word "five" for the word "ten" in line 11.

Moved and seconded that the section as amended be adopted. Vote and carried.

II Proceedings and Debates of the Constitutional Convention of Idaho 1415 (1912). At most, it appears that the five-day time limit was intended to be controlling while the legislature remained in session so as to afford the legislature a longer opportunity to reconsider disapproved bills. It does not appear that the two time limits are at all related or that the five days must somehow be taken as a universal minimum to be applied both before and after adjournment. If anything, since the ten-day time period after adjournment was not shortened, it appears more firmly entrenched by negative implication.

Unlike the five day period during the session, which affects the conduct of legislative business, the legislature, once it has adjourned, can have no genuine interest in the speed with which a gubernatorial veto is made. It is only the functions and prerogatives of the office of governor which could be made to suffer from an interpretation of article 4, § 10 which would permit less than ten days for consideration of bills following presentment after adjournment. We conclude that the governor has ten full days from the date of presentment in which to consider bills presented to him after adjournment of the Idaho Legislature.

II.

With regard only to Senate Bill 1494, the Governor attempted to veto part of two sentences, doing so as a purported exercise of the partial veto power created by article 4, § 11 of the Idaho Constitution:

§ 11. DISAPPROVAL OF APPROPRIATION BILLS.—The governor shall have power to disapprove of any item or items of any bill making appropriations of money embracing distinct items, and the part or parts approved shall become a law and the item or items disapproved shall be void, unless enacted in the manner following: If the legislature be in session, he shall within five days transmit to the house within which the bill originated a copy of the item or items thereof disapproved, together with his objections thereto, and the items objected to shall be separately reconsidered, and each item shall then take the same course as is prescribed for the passage of bills over the executive veto.

The question is whether the Governor's action was a valid exercise of the power granted him by this section. In order to conclude that the partial veto was properly exercised three questions must be answered in the affirmative: (1) Was the bill in question an "appropriation bill" within the meaning of this section? (2) Did the language stricken constitute an "item or items" within the meaning of this section? (3) Was the veto power exercised only in a negative way, and not in an affirmative way? If the answer to any one of these questions be "no," the attempted veto must be held ineffective and void.

A.

Neither party has discussed whether Senate Bill 1494 is in fact an "appropriation bill." The bill is an act of general legislation which, in the first five sections, revises the state employee salary-setting procedure. Section six makes one lump sum appropriation from the general fund to the state board of examiners to be used to supplement appropriations made to the various executive, legislative and judicial state

agencies for fiscal year 1977 personnel costs. The language in section six which was vetoed directs that the appropriation specifically be used to implement the substantive sections of the bill. Each party has apparently assumed that the item veto power can be exercised against bills of this type. In view of the lack of briefing and argument on this point, our holding is not hinged on whether Senate Bill 1494 is an appropriation bill. We base our holding on independent, alternate grounds. However, since our research raises significant doubts that article 4, § 11 was intended to apply to bills such as Senate Bill 1494, a brief discussion is warranted.

The title of article 4, § 11, "Disapproval of Appropriation Bills," indicates that this veto section provides for vetoes of appropriation bills as distinct from vetoes of acts of general legislation, which may only be approved in toto or vetoed in toto under the provisions of article 4, § 10. What, then, is an "appropriation bill"? Is it any bill containing at least one appropriation of money, or, is it a bill the sole object of which is to appropriate money for one or more purposes, or is it something in between these two alternatives? The language of the section says that the power of partial veto applies to "any bill making appropriations of money embracing distinct items." This language seemingly excludes bills making only one appropriation embracing one item.

The Oklahoma Supreme Court interpreted an item veto provision applying to "[e]very bill passed by the Legislature making appropriations of money embracing distinct items" to apply only to those bills where more than one item of appropriation was made. *Regents of State University v. Trapp,* 28 Okl. 83, 113 P. 910 (1911). *See generally Commonwealth v. Barnett,* 199 Pa. 161, 48 A. 976 (1901) (dissenting opinion).

In *Bengzon v. Secretary of Justice,* 299 U.S. 410, 57 S.Ct. 252, 81 L.Ed. 312 (1937), the United States Supreme Court considered the item veto power of the Governor General of the Philippines under a statute which read, "The Governor General shall have the power to veto any particular item or items *of an appropriation bill,* but the veto shall not affect the item or items to which he does not object." The Court clearly distinguished between a bill in the general sense and an appropriation bill:

> The term "appropriation act" obviously would not include an act of general legislation; and a bill proposing such an act is not converted into an appropriation bill simply because it has had engrafted upon it a section making an appropriation. An appropriation bill is one the primary and specific aim of which is to make appropriations of money from the public treasury. To say otherwise would be to confuse an appropriation bill proposing sundry appropriations of money with a bill proposing sundry provisions of general law and carrying an appropriation as an incident.

*Id.* at 413, 57 S.Ct. at 254. An act of general legislation one section of which appropriated the necessary sum to carry out the purposes of the act was held not to be an appropriation bill. Likewise, the Supreme Court of Mississippi has held that a constitutional provision allowing the partial veto of "any appropriation bill" relates to "general appropriation bills, or those containing several items of distinct appropriations; that is to say, special appropriation bills, with distinct items of appropriation. It applies to such as are made up of parts, and consist of portions separable from each other as appropriations." *State v. Holder,* 76 Miss. 158, 23 So. 643, 644 (1898). *See also Fulmore v. Lane,* 104 Tex. 499, 140 S.W. 405, 412, 1082 (1911).

The above discussion is dictum and serves only to give notice that should this issue again come before the Court, fully briefed and argued, we would be inclined to hold, in view of the above authorities, that acts of general legislation containing one item of appropriation for the purpose of implementing the provisions of the act, such as Senate Bill 1494, are not appropriation bills within the meaning of article 4, § 11.

**B.**

■ We next consider whether the vetoed language constituted an "item or

412

items." This question was raised and discussed by the parties and our holding thereon is dispositive of the partial veto issue. The affected parts of section six of the bill, with the stricken language indicated, were as follows:

SECTION 6. (1) There is hereby appropriated the sum of $1,693,700 from the general fund to the state board of examiners to be used to supplement appropriations made to the various state executive, legislative and judicial agencies funded wholly or in part from the general fund for fiscal year 1977 for personnel costs. ~~The appropriation herein made is specifically to be used to implement the provisions of sections 67-5309B and 67-5309C, Idaho Code, for these positions,~~ which are funded wholly or in part from the general fund, except for those positions for which a salary is fixed by law.

(2) The state board of examiners shall determine, or have determined under its authority, the number of dollars that each state executive, legislative or judicial agency funded wholly or in part from the general fund needs to have allotted to it from the appropriation made in subsection (1) above to provide the dollars for salaries and wages and personnel benefits for all positions ~~eligible under the provisions of sections 67-5309B and 67-5309C, Idaho Code.~~ The moneys so determined for each agency shall be allotted by the state board of examiners to each agency and shall constitute an appropriation in the amount determined by the state board of examiners, and shall be so treated by the state auditor, and by the division of budget, policy planning and coordination.

The language stricken obviously is not itself an appropriation of money. Rather, it is a condition or proviso directing how the money appropriated shall be spent. Does the governor have the power to veto anything other than a specific appropriation of money? In *Wheeler v. Gallet,* 43 Idaho 175, 249 P. 1067 (1926), the opinion of the Court listed three dictionary definitions of the word "item." [3] Each of these definitions emphasized the numerical and monetary connotations of the word and we think that the Court there understood the constitutional language to mean items of appropriation of money. The Governor argues that nothing in the language of the section requires the item veto to be limited to *money* items. We think that upon close examination of the language it is clear that this proposition is incorrect. The phrase "embracing distinct *items* " modifies the phrase "appropriations *of money.*" Thus the words "any bill making appropriations of money embracing distinct items" clearly refer to *items of appropriation of money.* Obviously the word item can not be given different meanings within the same sentence. We hold that the language empowering the governor to "disapprove of any item or items" of an appropriation bill means that he may disapprove only items of appropriation of money.

Our holding here is bolstered by the similar treatment which other courts have given the words "item" and "part" found in a variety of item veto provisions. We found no reported decision *discussing* the meaning of the word "item" contained in a constitutional provision that approaches similarity to the Idaho provision. However, in two cases construing such provisions it was clearly assumed that "item" meant a money item. *Regents of State University v. Trapp,* 28 Okl. 83, 113 P. 910 (1911); *State ex rel. Jamison v. Forsyth,* 133 P. 521 (Wyo. 1913). The majority rule, in cases constru-

3. "Item" is defined by Webster's Dictionary as:
"An article; a separate particular in an enumeration, account, or total; a detail; as, the items in a bill."
Standard Dictionary defines it as:
"A separate article or entry in an account or schedule; a sum entered."
A new English Dictionary, edited by James A. H. Murray, L.L.D. defines it as:

"An article or unit of any kind included in an enumeration, computation, or sum total; an entry or thing entered in an account or register, a clause of a document, a detail of expenditure or income, etc."
*Id.* at 178, 249 P. at 1067.

ing language arguably more ambiguous on its face than the Idaho language, is succinctly stated by the *Virginia Supreme Court in Commonwealth v. Dodson,* 176 Va. 281, 11 S.E.2d 120, 127 (1940): "An item in an appropriation bill is an indivisible sum of money dedicated to a stated purpose. It is something different from a provision or condition, and where conditions are attached, they must be observed; where none are attached, none may be added." *Accord, Bengzon v. Secretary of Justice,* 299 U.S. at 414, 57 S.Ct. at 254; *State v. Holder,* 23 So. at 644. *But see State ex rel. Turner v. Iowa State Highway Comm'n,* 186 N.W.2d 141 (Iowa 1971); *State ex rel. Dickson v. Saiz,* 62 N.M. 227, 308 P.2d 205 (1957). In both of the latter cases the constitutional language appears more liberal on its face than the Idaho language. In fact, in *State v. Saiz* the New Mexico Supreme Court, in distinguishing the language in the New Mexico constitution from language in the North Dakota and Wyoming constitutions (nearly identical to that found in the Idaho constitution), expressed its view that the latter was meant to apply to items of appropriation of money. *State v. Saiz,* 308 P.2d at 210.

Our interpretation of the word "item" accords with the purpose for which item veto provisions were inserted into state constitutions, i. e., to prevent the practice of logrolling and the resultant passage of omnibus appropriation bills. *Bengzon v. Secretary of Justice,* 299 U.S. at 415, 57 S.Ct. at 254; *Fairfield v. Foster,* 25 Ariz. 146, 214 P. 319 (1923); *State v. Holder,* 23 So. at 644; *State ex rel. Sandaker v. Olson,* 65 N.D. 561, 260 N.W. 586 (1935). Such bills combined necessary and proper items of appropriation with unnecessary or even indefensible special interest items. If the only weapon available to the governor to fight such legislation was the general veto power,

> the Governor might often be required to destroy much good legislation in order to

defeat one item of a bill that was bad, or, on the other hand, be compelled to approve a piece of legislation vicious in part,. in order to obtain the benefits of the salutary provision of the same act.

*Regents of State University v. Trapp,* 113 P. at 913. In order to allow the governor a measure of flexibility in dealing with appropriation bills combining several items of appropriation the constitutional framers included an item veto section.

> In plain English, they wished the Governor to have the right *to object to the expenditure of money for a specific purpose and amount,* without being under the necessity of at the same time refusing to agree to another expenditure which met his entire approval.

*Fairfield v. Foster,* 214 P. at 322 (emphasis supplied).

We also note that in the Idaho Constitution there is a section specifically designed to prevent the evil of omnibus bills embracing *several subjects of general legislation* in one bill or attaching special interest riders to popular and necessary legislation. Idaho Const. art. 3, § 16.[4] Since the governor will not, in theory at least, be faced with bills combining good and bad legislation on different subjects, there can be no need of an item veto power *as to acts of general legislation.* We think it is clear that the *item* veto power was intended to and does apply solely to distinct money items in appropriation bills.

### C.

The veto attempted here must fail for the additional, independent reason that any veto power may be exercised only in a negative way. An excellent explanation of the negative nature of the partial veto power appears in *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975, 981 (N.M. 1974):

---

4. § 16. UNITY OF SUBJECT AND TITLE.— Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title.

The power of partial veto is the power to disapprove. This is a negative power, or a power to delete or destroy a part or item, and is not a positive power, or a power to alter, enlarge or increase the effect of the remaining parts or items. It is not the power to enact or create new legislation by selective deletions. *Bengzon v. Secretary of Justice,* 299 U.S. 410, 57 S.Ct. 252, 81 L.Ed. 312 (1937); *Fitzsimmons v. Leon,* 141 F.2d 886 (1st Cir. 1944); *State v. Holder,* 76 Miss. 158, 23 So. 643 (1898); *State ex rel. Cason v. Bond* [495 S.W.2d 385, Mo.1973], supra; *Veto Case,* 69 Mont. 325, 222 P. 428 (1924); *Fulmore v. Lane,* supra. Thus, a partial veto must be so exercised that it eliminates or destroys the whole of an item or part and does not distort the legislative intent, and in effect create legislation inconsistent with that enacted by the Legislature, by the careful striking of words, phrases, clauses or sentences.[5]

The language stricken in this instance directed that the appropriation be specifically used to implement the new salary classifications and salary schedule required by other sections of the bill. The elimination of the directory language would have the effect of enlarging the number of state employees who would receive salary adjustments from the money appropriated. It is clear from the Governor's veto message that he intended to alter the scope of the appropriation by the elimination of the condition placed on it by the Legislature:

My action is not intended to defeat the wishes of the Legislature in allowing salary adjustments for classified and exempt employees. However, it appears that amendments made to the bill late in the session may have subverted this original intent. While the appropriation language addresses itself in broad terms to all branches of government indicating a

desire to include exempt employees, specific statutory references are made to sections within the bill which would only allow adjustments for classified employees.

The Board of Examiners, which is given the responsibility of implementation, must have the flexibility to insure that those state employees whom the Legislature intended to benefit are dealt with in an equitable manner.

However laudable the Governor's motives in seeking to correct the Legislature's act of "subverting" its own original intent, it was not for him to decide what the Legislature intended. To allow a partial veto of this type to stand, is to allow the Governor to create a new law that the Legislature did not pass. This clearly is a usurpation of the legislative function and can not be tolerated under the guise of a purported exercise of the power granted by article 4, § 11. Other courts which have considered the question have unanimously concluded that a governor may not veto a condition or proviso of an appropriation while allowing the appropriation itself to stand because that would amount to affirmative legislation by executive edict. *Fairfield v. Foster, supra; State v. Holder, supra; City of Helena v. Omholt,* 155 Mont. 212, 468 P.2d 764 (1970) (dictum); *State ex rel. Sego v. Kirkpatrick, supra; Fulmore v. Lane, supra; Commonwealth v. Dodson, supra.*

The attempted partial veto of Senate Bill 1494 was ineffective and void because not within the power of partial veto granted to the governor by article 4, § 11 of the Idaho Constitution.

Affirmed as to Senate Bill 1494. Reversed as to Senate Bill 1428.

No costs allowed.

McFADDEN and BAKES, JJ., concur.

5. The definition of "item" is broader under the wording of the New Mexico Constitution, but the same general precepts as to the nature of the veto power apply to the Idaho provision. In view of our definition of "item," officials and courts in Idaho will undoubtedly have fewer occasions upon which to seek an answer to the question whether the veto power is exercised in an appropriately negative fashion. However, we can not foresee all possible situations which may arise and it seems best to keep the policies underlying the veto power firmly in mind at all times.

DONALDSON, Justice, dissenting in part and concurring in part.

I dissent from Part I of the majority opinion. The district court's interpretation of the time frame involved seems reasonable to me, does less violence to the clear mandate of the Constitution, and should be upheld on appeal.

The problem in this case stems from the delayed presentment. The Constitution gives two different time schedules for vetoes, as pocket vetoes are not allowed. The Governor has either ten days after adjournment or five days after presentment in which to veto a bill.

The Constitution is very clear on the one alternative power, "in which case it shall be filed, with his objections, in the office of the secretary of state within ten days after such adjournment (Sundays excepted) or become law." Idaho Const., art. 4 § 10.

Within ten days after adjournment means exactly what it says. The other way to veto a bill is within five days after presentment. In this case the Governor did neither.

The majority embarks upon a hypothetical situation which presents an abstract problem, but is not warranted by the facts. The bills in this case were presented to the Governor within three days after adjournment of the legislature as required by the rules. There is no reason to speculate as to what would happen were presentment delayed until after ten days from adjournment because that has not happened.

A similar argument was rejected by the Supreme Court of West Virginia:

The common practice of staying the hands of the clock to enable the Legislature to effect an adjournment apparently within the time fixed by the Constitution for the expiration of the term is dwelt upon in the argument as a serious trespass upon the rights of the executive in respect to the time allowed him for examination of, and action upon, bills undisposed of by him at the time of adjournment; it being pointed out that he might thus be deprived of the entire period of five days. In point of fact no serious curtailment of this period has ever occurred in the history of the state, and the assumption that it will ever occur would be a violent and highly improbable one. . . . The Constitution was adopted by the people, with full knowledge of the existence of this rule of evidence, and no provision was inserted to protect the Governor or any person else from its operation and effect. How can we say they did not think it better for the public to take the risk of slight, or even great, abuse or perversion of it, than to innovate upon the rule, or that they did not rightly and safely assume that no substantial encroachment would ever be made by the Legislature upon the time of the executive in this way? In more than 45 years it has never yet occurred. The few hours so taken is in a practical sense no encroachment at all, since the Governor and Legislature may both work at the same time. If the evil should grow and become serious, the power of remedy is in the hands of the people rather than those of the courts.

*Capito v. Topping,* 65 W.Va. 587, 64 S.E. 845, 847–848 (1909).

The Attorneys General of Oregon have consistently come to the same conclusion on speculation concerning potential for abuse in a like case.

The argument was made that if bills may be presented after adjournment of the legislature there is nothing to prevent delaying the presentment indefinitely. The Supreme Court of Vermont adequately answered that argument by saying, 114 A. 44, at p. 50: " * * * public officers are bound to perform their duties with diligence and fidelity. That they may act otherwise cannot be assumed as a justification for denying them the right to act at all." We believe that this case answers the argument that if a bill may be presented to the Governor after adjournment, it could be presented so late as to defeat the veto power.

Opinions of the Attorney General of the State of Oregon, # 5204, p. 189, April 19, 1961.

I also note that former Governor Andrus was always previously able to review the work of the legislature within the ten days allotted. Secretary of State Cenarrusa has presented us with a table on gubernatorial action which is relevant in documenting this point.

| Legislature | Year | No. of Pages | Sine die Date | (Sun.exc) 10th Day after Adjourn. | Date of Last Action by Governor |
|---|---|---|---|---|---|
| 41st 1st Reg. | 1971 | 1,517 | Mar. 20 | Apr. 1 | Mar. 30 *** |
| 41st 1st Extra | 1971 | 43 | Apr. 8 | Apr. 20 | Apr. 13 *** |
| 41st 2nd Reg. | 1972 | 1,373 | Mar. 25 | Apr. 6 | Apr. 3 *** |
| 42nd 1st Reg. | 1973 | 880 | Mar. 13 | Mar. 24 | Mar. 17 *** |
| 42nd 2nd Reg. | 1974 | 3,009 | Mar. 30 | Apr. 11 | Apr. 5 *** |
| 43rd 1st Reg. | 1975 | 857 | Mar. 22 | Apr. 3 | Mar. 31 *** |

*** Cecil D. Andrus, Governor

———

In sum, I feel this case should be decided on the facts of what actually happened in the case and not upon speculation and conjecture as to what could possibly happen. The bills were not vetoed within ten days after adjournment, nor were they vetoed within five days after presentment. They should, therefore, become law, as the Idaho Constitution requires.

SHEPARD, C. J., concurs.