**STATE of Oklahoma ex rel. William J. WISEMAN, Jr., Petitioner,**

v.

**OKLAHOMA BOARD OF CORRECTIONS, and Oklahoma Department of Corrections, Respondents.**

No. 52532.

Supreme Court of Oklahoma.

Dec. 15, 1978.

Order of Jan. 31, 1979.

As Corrected On Denial of Rehearing July 15, 1980.

M. David Riggs, Chapel, Wilkinson, Riggs, Abney & Keefer, Tulsa, for petitioner.

Larry Derryberry, Atty. Gen. of Oklahoma, Gerald E. Weis, Asst. Atty. Gen., Chief, Civil Div., Oklahoma City, for respondents.

IRWIN, Justice.

On the last day of the 1978 regular session of the Legislature, the Senate and House of Representatives passed and presented to Governor David L. Boren Enrolled House Bill No. 1567. Within fifteen days thereafter the Governor approved and signed the bill except he specifically vetoed and disapproved section 17. This section, inter alia, required the Board Of Corrections to establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board; and required the Department of Corrections to certify to the Pardon and Parole Board the total inmate population incarcerated in the various institutional facilities under their custody. Neither the Board of Corrections nor the Department of Corrections (respondents) complied with section 17 because of the Governor's veto.

In this original proceeding, William J. Wiseman, Jr., (Petitioner) seeks a Writ of Mandamus directing respondents to comply with section 17 notwithstanding its veto by the Governor.

This is a matter of great public concern. Accordingly, we assume jurisdiction under the rationale of *Phillips v. Oklahoma Tax Commission*, Okl., 577 P.2d 1278 (1978).

House Bill 1567 contained several general legislation (non-appropriation) sections of provisions relating to the operation, duties and responsibilities of the Board of Corrections and the Department of Corrections and their officials and employees. It also contained several sections or provisions making appropriations of money embracing distinct items. Section 17, which the Governor vetoed, involved general legislation as distinguished from an item of appropriation.

The force and effect of the Governor's veto of section 17 and his approving and signing HB 1567 in all other respects is the fundamental issue presented.

The parties concede the Governor's power to approve or disapprove (veto) bills, or parts thereof, is limited by the Constitution and he can act only in the manner specified and can exercise only those powers granted him. Secs. 11 and 12, Article 6, Const. are the only constitutional provisions that dis-

cuss a Governor's power to approve or disapprove a legislative bill presented to him. Section 11, Art. 6, Okl.Const. provides:

"APPROVAL OR VETO OF BILLS—PASSAGE OVER VETO—FAILURE TO RETURN BILL. Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise to reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the Journal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. *No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment.*" (emphasis ours)

Section 12, Art. 6, Okl.Const. provides:

"APPROPRIATION BILLS—APPROVAL OR DISAPPROVAL—EMERGENCY BILLS. *Every bill passed by the Legislature, making appropriations of money embracing distinct items,* shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, *but all items not disapproved shall have the force and effect of law according to the original provisions of the bill.* Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills: Provided, That this section shall not relieve emergency bills of the requirement of the three-fourths vote." (emphasis ours).

Section 11, relates to "Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature * * *." Sec. 12, relates to "Every bill passed by the Legislature, making appropriations of money embracing distinct items, * * *." The above quoted portion of Sec. 11 is general, and standing alone, would indicate that Sec. 11 would include every kind of bill, i. e., all general legislation bills and all appropriation bills. This is particularly true since Sec. 11 makes no reference to the kind of bills that come within its purview. However, that part of Sec. 12 quoted above particularizes and defines the kind of bills it deals with, i. e., "Every bill * * * making appropriations of money embracing distinct items." The presumption and legal intendment is that each and every clause in a Constitution has been inserted for some useful purpose and the entire Constitution must be construed as a whole. It would therefore follow that "Every bill * * * making appropriations of money embracing distinct items" is not within the purview of Sec. 11, but is governed by Sec. 12. At least the appropriation provisions or sections would be under Sec. 12.

This Court discussed the application of sections 11 and 12 in *Carter v. Rathburn*, 85 Okl. 251, 209 P. 944 (1922). In discussing Sec. 11, the Court said:

"Section 11 above applies to all bills as a whole. That is, bills in their entirety. No bill in its entirety becomes a law without compliance with the provisions of

said section. Any bill becomes a law as a whole when such provisions are complied with. The provisions are plain and, in our opinion, need no construction further than that they mean what they say."

The Court observed with respects to Sec. 12 that an exception to the general provisions of Sec. 11 was created to specifically deal with an appropriation bill making appropriations for distinct items. The Court said: "* * * [the Constitutional Convention] in order to relieve such a bill from the restrictions imposed under Sec. 11, supra, and to free it from danger of being defeated as a whole, made provisions whereby separate items in such a bill may be disapproved and cut out by the Governor without affecting the bill in its entirety."

Another distinction between Section 11 and 12 should be mentioned at this time. Under Sec. 11 "No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment." Under this proviso an affirmative approval by the Governor is necessary for a bill to become law. Although Sec. 12 provides for the disapproval of a bill by the Governor "or any item, or appropriation therein contained," it contains a proviso that "all items not disapproved shall have the force and effect of law according to the original provisions of the bill." A fair reading of Sec. 12 indicates that any item not disapproved by the Governor shall have the force and effect of law.

HB 1567, now under consideration, not only contains several sections or provisions "making appropriations of money embracing distinct items," but also contains several general legislation sections or provisions which may be categorized as "non-appropriation" sections or provisions. It necessarily follows that parts of HB 1567 are dealt with by Sec. 11 and parts of it are dealt with by Sec. 12.

*Regents of State University v. Trapp*, 28 Okl. 83, 113 P. 910 (1911), and *Peebly v. Childers*, 95 Okl. 40, 217 P. 1049 (1923), clearly show a distinction between the operative effect of Secs. 11 and 12 when an appropriation bill containing only one item of appropriation is presented to the Governor and when a bill "making appropriations of money embracing distinct items" is presented. The appropriation bill in *Trapp* embraced only one item of appropriation and also contained a section setting forth how the appropriation would be apportioned. The bill was presented to the Governor less than five days before the final adjournment of the Legislature. The Governor, within fifteen days after the Legislature adjourned, reduced some of the items of apportionment, and, as thus reduced, approved the bill. In *Trapp*, the Court held:

"Section 12, Art. 6, Const., providing that the Governor may disapprove any item of a bill making appropriations of money embracing distinct items, does not apply to a special appropriation bill containing only one item of appropriation for the support and maintenance of the State University; and the act of the Governor approving the bill in part and disapproving other parts thereof, directing how the funds appropriated shall be apportioned, is a nullity."

The Court said that Sec. 11 of Art. 6 of the Constitution:

"* * * grants to the Governor the legislative power of the veto. By reason of that section no bill which is sent to the Governor less than five days before the adjournment of the Legislature can become a law without the approval of the Governor, unless passed over his veto; and it cannot become a law with his approval, unless approved by him within 15 days after such adjournment. *By the veto power conferred upon the Governor by this section, he is authorized to approve or disapprove an act only in toto. He may not approve a part and disapprove a part, but section 12, art. 6, Const., provides for an exception, in that by it power is conferred upon the Governor to approve some items of certain bills and disapprove others.*" (emphasis ours)

Since the Legislative bill in *Trapp* contained only one item of appropriation and came within the purview of Sec. 11 and was

presented to the Governor less than five days before final adjournment, it was necessary for the Governor to approve the bill in toto for it to become law. An affirmative approval was essential. Having no authority to approve it in part and veto it in part, the Governor's attempt to do so was a nullity. Since the Governor did not approve the bill as required by Sec. 11, the bill did not become law.

In *Peebly*, supra, the Legislature had passed and presented to the Governor what was generally known as the "Institution bill", which made appropriations for numerous institutions within the State, among these being an appropriation for salaries to the State University of $700,000.00 for the year ending June 30, 1924, and $720,000.00 for the year ending June 30, 1925. The Governor, after the final adjournment, drew a line through the $700,000.00 and the $720,000.00 appropriations and then wrote "approved in the sum of $500,000.00 only." After reducing other items of the bill in the same manner and disapproving other items in full, the Governor appended thereto the following words in reference to the State University appropriation.

"Approved * * * except as to item stricken and specifically disapproved and except as to the following items: Page 2, State University * * * salaries $700,-000.00 reduced to $500,000.00 and $720,-000.00 reduced to $500,000.00. Signed J. C. Walton, Governor."

The plaintiff in *Peebly*, supra, who sought to enjoin the payment of salaries for the University under the "Institutional bill", urged that *Trapp*, supra, was applicable and that under *Trapp*, the appropriation bill was a nullity.

The Court in *Peebly* said that under Sec. 11 an affirmative approval was essential to a bill becoming a law, while under Sec. 12, no affirmative action on the part of the Governor was necessary to vitalize a bill making appropriations of money embracing distinct items, but in order to veto any appropriation or distinct item the governor was required to disapprove the objectionable appropriation or item in toto. The

Court held that the action of the Governor in attempting to partially approve and partially disapprove an individual distinct item in the Institutional Appropriation Bill was an unauthorized and futile gesture wholly ineffective for any purpose. Thus, the Institutional Appropriations Bill had the force and effect of law according to its original provisions.

Most certainly the Governor could have successfully exercised the partial veto as to the entire $700,000.00 appropriation for the fiscal year of 1924 or the entire $720,000.00 appropriation for the fiscal year of 1925, but he could not reduce those appropriations and as reduced approve the bill. Since the governor had no authority to partially veto each separate appropriation and since Sec. 12 provides that bills making appropriations of money embracing distinct items need not have the approval of the governor to become law, the exercise of the veto power in an unauthorized manner had no effect whatsoever.

The *Trapp* and *Peebly* cases support the following: Sec. 11 of Article 6, Const., is applicable to general legislation bills (non-appropriation bills) and bills containing only one item of appropriation. Bills falling within this category may not be approved in part and disapproved (vetoed) in part, but the governor must approve or disapprove such bill in toto. An affirmative, unqualified approval is essential for all or any part of the bill to become law and a qualified approval is ineffectual for any purpose and is a nullity. A qualified approval is tantamount to a "pocket veto" and the bill does not become law.

Section 12 of Art. 6, Okl.Const., is an exception to Sec. 11, and is applicable only to a bill "making appropriations of money embracing distinct items." No affirmative action on the part of the governor is necessary to vitalize a bill making appropriations containing distinct items because all items not disapproved shall have the force and effect of law. However, in order to disapprove any distinct item, the governor is required to disapprove the objectionable item in toto. Any attempt to disapprove a

distinct item in part is unauthorized and wholly ineffectual for any purpose and is tantamount to it "not being disapproved" and such item of appropriation shall have the force and effect of law.

Since *Trapp* involved an appropriation bill containing only one item of appropriation and *Peebly* involved an institutional bill "making appropriations of money embracing distinct items", neither decision discussed the specific kind of bill presented in the case at bar, i. e. a bill containing several general legislation sections or provisions and several sections or provision making appropriations of money embracing distinct items. The Governor did not disapprove (line item veto) an appropriation of money embracing a distinct item in the case at bar but vetoed a general legislation provision. Query: When a bill is presented to the Governor which contains general legislation provisions and other provisions making appropriations of money embracing distinct items, is the Governor's power of veto prescribed by sec. 11 or sec. 12 or both?

■ In our opinion, neither sec. 11 nor sec. 12 operates to the exclusion of the other. To hold that they did would not only do violence to the Constitution, but would violate the underlying philosophy in *Trapp* and *Peebly*. Although sec. 11 makes no reference to the kind of bills that fall within its field of operation, sec. 12 is very clear in limiting its operation to bills "making appropriations of money embracing distinct items." The language of sec. 12 permits no other reasonable conclusion. HB 1567 is a bill "making appropriations of money embracing distinct items", although it is at the same time a bill containing provisions of a general legislative nature. The Governor may disapprove any multiple appropriation bill as a whole "or any item, or appropriation therein contained, * * * but all items not disapproved shall have the force and effect of law according to the original provisions of the bill." The word "item" is used consistently throughout the section and from the outset, it is used in connection with the appropriation of money. Nothing in sec. 12 suggests or indicates that it is

applicable to bills relating to general legislation, or any general legislation provisions.

Since sec. 12 is applicable only to bills "making appropriations of money embracing distinct items", the Governor's authority to approve or veto general legislation (non-appropriation sections or provisions) must be found in sec. 11. As stated in the *Trapp* case, "[B]y the veto power conferred upon the Governor by this section, he is authorized to approve or disapprove an act only in toto. He may not approve a part and disapprove a part, * * * ."

■ Were we to hold the Governor's power to veto was controlled entirely by sec. 11, to the exclusion of sec. 12, the Governor's qualified approval in the case at bar would be·ineffective and no part of HB 1567 would have become law under *Trapp*, supra. Such a holding would deprive the Governor of his constitutionally granted power to line item veto any appropriation or item of appropriation in a bill making appropriations of money embracing distinct items. On the other hand, were we to hold sec. 12 to be exclusively applicable without reference to sec. 11, the Governor would be granted by judicial construction a new veto power not contemplated by the constitution, i. e. the power to line item veto general legislation provisions. The only logical conclusion clearly within the framework of secs. 11 and 12, is to hold, and we do hold, that the general legislation provisions of HB 1567 are controlled by sec. 11 and the provisions making appropriations of money embracing distinct items are controlled by sec. 12.

■ Since the Governor had to affirmatively approve all of the general legislation provisions of HB 1567 for such provisions to become law, and the Governor's approval was qualified by reason of his vetoing sec. 17, his qualified approval was a nullity. The Governor, having failed to approve HB 1567 within fifteen days after the adjournment of the Legislature, the general legislation sections or provisions of HB 1567 failed to become law. Since none of the general legislation provisions of HB 1567, including sec. 17, became law, petitioner is not enti-

tled to a writ directing respondent to comply with sec. 17. However, since the Governor did not disapprove any item or items of appropriation contained in the bill, all appropriation items have the force and effect of law according to the original provisions .of HB 1567, because they do not need specific approval from the Governor to become law.

■ Respondent argues that sec. 17 of HB 1567 bears no legitimate connection with or natural relation to the appropriations made by HB 1567, or for that matter, any of the general legislation sections of the bill. Respondent contends sec. 17 is invalid under the one subject standard set forth in sections 56 and 57 of Art. V, Okl. Const. In view of our reaching the conclusions heretofore set forth and for the further reason neither party contends the remainder of HB 1567 is unconstitutional, we will not consider or determine whether HB 1567 contravenes sections 56 and 57, supra. See *Schwartz v. Diehl*, Okl., 568 P.2d 280 (1977), wherein we said that Courts will pass upon the constitutionality of a statute only when it is necessary to a determination of the merits of the case.

■ The orderly administration of our state government, and in particular the operation of the Oklahoma Board of Corrections and the Oklahoma Department of Corrections, require the effective date of this decision be postponed until some future date. It is therefore ordered that this decision shall become effective at 12:01 o'clock A. M. Thursday, February 1, 1979.

APPLICATION TO ASSUME ORIGINAL JURISDICTION GRANTED; PETITION FOR WRIT OF MANDAMUS DENIED.

Justice Denver N. Davison, having certified his disqualification by reason of his pending retirement, District Judge Charles L. Owens was appointed Special Justice in his stead. Justice Rudolph J. Hargrave, Justice Davison's successor in office, honored the special appointment and did not participate.

Justice William A. Berry, having certified his disqualification by reason of his pending retirement, District Judge Alma J. Wilson was appointed Special Justice in his stead. Justice Marian P. Opala, Justice Berry's successor in office, honored the special appointment and did not participate.

HODGES, C. J., LAVENDER, V. C. J., BARNES, J., and OWENS, Special Justice, concur.

WILLIAMS, SIMMS and DOOLIN, JJ., and WILSON, Special Justice, dissent.

WILSON, Special Justice, joins with SIMMS, J., concurring in the dissenting views · filed and promulgated herein by DOOLIN, J.

WILLIAMS, J., presents dissenting opinion for filing and promulgation.

Thereupon,

Rehearing is denied.

DOOLIN, Justice, dissenting:

The majority's analysis of the governor's attempted veto, and his power and lack of power in respect to it, is strikingly accurate under Art. 6, §§ 11 and 12, and decisions interpreting these two sections. But I cannot join in creating the strained approach of the majority in its Herculean attempt to validate the appropriations contained in HB 1567. I therefore dissent.

There is no doubt a chief executive may partially disapprove a general appropriation bill under § 12. This "line item" veto power however, is limited to general appropriation bills and applies neither to special appropriation bills nor general legislation. HB 1567 can scarcely be denominated a general appropriation bill as defined by Art. V, § 56 and cannot be categorically placed under either this section or § 12. The majority's innovative endeavor to bisect HB 1567 and apply § 12 to the appropriations and § 11 to the balance treats as two bills that which was born as one. I do not believe this type manipulation of legislation is either proper or wise.

The majority's structured anomaly is in .direct conflict with Art. V, §§ 56, 57 of our constitution. Section 56 provides:

"The general appropriation bill shall embrace nothing but appropriations for the expenses of the executive, legislative, and judicial departments of the State, and for interest on the public debt. The salary of no officer or employee of the State, or any subdivision thereof, shall be increased in such bill, nor shall any appropriation be made therein for any such officer or employee, unless his employment and the amount of his salary, shall have been already provided for by law. *All other appropriations shall be made by separate bills, each embracing but one subject.*" (Emphasis supplied).

Section 57 further provides:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills  . . . ."

This court should not create confusion by making two bills out of HB 1567, then ignore constitutional sections which appear to invalidate its construction. The majority holds at least a portion of the bill has become law. Thus its constitutionality *is* an issue. HB 1567 either covers two subjects or it does not. If it encompasses two it violates §§ 56, 57; if it encompasses only one, § 11, not § 12 must be applied.

In *Regents of State University v. Trapp, 28 Okl. 83, 113 P. 910 (1911)* this court said a governor's power of partial disapproval under § 12 is limited to general appropriations bills. HB 1567 is not a general appropriations bill. Under *Trapp*, § 12 should not be applied to any portion of HB 1567.

Under § 11 if the governor does not approve a bill in toto within fifteen days after adjournment it does not become law. He

did not do so. His qualified approval is tantamount to a pocket veto and thus HB 1567 did not become law. This construction is admitted by the majority. But because of the extreme result of such holding, the contrived solution of the majority will be the law.

The majority further seeks to soften the effect of its decision by postponing the effective date until after the Legislature convenes. This same "postponement" if valid,[1] could be used if the entire bill was invalidated because of improper use of the veto.

I am authorized to state that SIMMS, J. and WILSON, Special Justice, concur in the views expressed herein.

### ORDER

It is hereby ordered that the date of February 1, 1979, specified in the opinion promulgated and filed in this cause on December 15, 1978, as the effective date of such opinion, be and the same is postponed until the further order of this Court.

WILLIAMS, Justice (dissenting):

I respectfully dissent to the opinion of the majority promulgated in this case for the reasons hereinafter stated.

Petitioner (hereinafter State, petitioner or relator)[1] asks this Court to assume original jurisdiction and issue a writ of mandamus[2] directing the respondents, the Oklahoma Board of Corrections (Board) and the Oklahoma Department of Corrections (Department), to comply with Section 17 (Section 17) of Enrolled House Bill No. 1567 (H.B. 1567), Ch. 273, O.S.L.1978,[3] passed by the 36th Legislature on April 28, 1978, the last day of the second period of the regular session, and thereafter approved by the Governor except for the simultaneous pur-

---

1. This action could be dangerous precedent. Might this court postpone an effective date until 1980, or 1984 or even 2000?

1. Relator's standing to sue is recognized. *Wiseman v. Boren*, 545 P.2d 753 (Okl.1976); *State ex rel. Poulos v. St. Brd. of Equalization*, 552 P.2d 1138 (Okl.1976). See also *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 981 (1974).

2. Both petitioner and respondents urge that we assume original jurisdiction, which we do, on the basis that this is a matter of great public concern. *Phillips v. Oklahoma Tax Commission*, 577 P.2d 1278 (Okl.1978).

3. H.B. 1567 approved by the Governor except for Section 17, consists of 26 sections. Several sections made appropriations of money to Board and Department. Several others related to the operation, duties and responsibilities of

ported veto of that section only.[4] Respondents, relying inter alia on the impact, on the bill and Section 17, by Article VI, Oklahoma Constitution, Sections 11[5] and 12,[6] respectively, and the Governor's purported veto of the section have refused to comply with it.

the Board, the Department and their officials and employees.

4. Section 17 provides that the Board of Corrections "shall establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board" including "minimum percentage of a sentence to be served before recommendation." It also provides that three times each year the Department of Corrections shall certify to the Pardon and Parole Board "the total inmate population in the various institutional facilities under their custody and control." The section further provides that "If, on any certification date, the total certified inmate population is greater than three thousand five hundred (3,500), then the minimum percentage [of a sentence to be served] shall be reduced five percent (5%) from the percentage applicable on the preceding certification date."

5. Section 11 of Article VI is as follows: "Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the Journal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the

I

Respondents admit that the first six sections of H.B. 1567 made appropriations to the Department. However, in briefs and oral presentation they argue that the bill is not an appropriation bill as contemplated by Section 56, Article V, Constitution;[7,8]

Governor within fifteen days after such adjournment".

6. Section 12 of Article VI provides: "Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any items, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills; Provided, That this section shall not relieve emergency bills of the requirement of the three-fourths vote."

7. Art. V, Sec. 56 is of provision as follows: "The general appropriation bill shall embrace nothing but appropriations for the expenses of the executive, legislative, and judicial departments of the State, and for interest on the public debt. The salary of no officer or employee of the State, or any subdivision thereof, shall be increased in such bill, nor shall any appropriation be made therein for any such officer or employee, unless his employment and the amount of his salary, shall have been already provided for by law. All other appropriations shall be made by separate bills, each embracing but one subject."

8. For the reason that Art. V, § 57, contains certain provisions of similar tenor to those of § 56 and one or respondents' arguments considered infra involves treatment of the two together, § 57 is here set forth. It reads as follows: "Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provid-

but that its true purpose is to legislate generally; that the bill is one "the specific aim" of which is "to regulate, or control the operations of the Department of Corrections with appropriations [being] incidental thereto." I do not agree.

Respondents cite the opinion of the U. S. Supreme Court in the case of *Bengzon v. Secretary of Justice*, 299 U.S. 410, 413, 57 S.Ct. 252, 81 L.Ed. 312 (1937) where that Court said, "An appropriation bill is one the primary and specific aim of which is to make appropriations of money from the public treasury".[9]

In *Bengzon*, supra, at page 414 of the U. S. Report, 57 S.Ct. at page 254, the Supreme Court had occasion to speak to this very subject. It there said:

The term "appropriation act" obviously would not include an act of general legislation; and a bill proposing such an act is not converted into an appropriation bill simply because it has had engrafted upon it a section making an appropriation. An appropriation bill is one the primary and specific aim of which is to make appropriations of money from the public treasury. To say otherwise would be to *confuse* an appropriation bill proposing sundry appropriations of money with a bill proposing sundry provisions of general law and carrying an appropriation as an incident. (Emphasis added.)

To be noted is the fact that the very first section of the bill, Section 1, alone appropri-

ated twenty-nine million-plus dollars from monies in the General Revenue Fund of the state treasury to the Department. Section Two appropriated a total of more than one and a half million dollars to it and Sections Three through Six made appropriations ranging from one hundred thousand dollars to in excess of one million nine hundred thousand dollars to the Department. Altogether, H.B. 1567 appropriated to Department for the fiscal year ending June 30, 1979, approximately $34,000,000.00.

In my view the various sections to which I have referred, respectively appropriate different amounts of money for the several indicated purposes of the overall corrections budget and pursuant to Art. VI, Section 12, are "distinct items" of money appropriated for such purposes. I do not agree that the sections appearing at the very forefront and throughout the bill and referred to in its title are "incidental" either as to nature of subject-matter or amount. I would hold that H.B. 1567 is not primarily an enactment of general legislative character but is in principal part, a bill appropriating money to Department and embracing distinct items.

## II

One argument advanced by respondents is to the effect that § 17 is an "item" that may be disapproved by the Governor under Section 12 of Article VI.[10] I do not agree.

---

ed, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to as much of the law as may not be expressed in the title thereof.

9. An "appropriation", as defined by this Court in the case of *State ex rel. Murray v. Carter*, 167 Okl. 473, 30 P.2d 700, 702 (1934) in turn quoted in Black's Law Dictionary, Fifth Edition (1979) means the "Authority given by Legislature to proper officers to apply distinctly specified sum from designated fund out of treasury in given year for specified object or demand against [the] State." See also *Blaine County Inv. Co. v. Gallet*, 35 Idaho 102, 204 P. 1066, 1067 (1922). Black's Dictionary, Fifth Edition, citing *State ex rel. Finnegan v. Dammann*, 220 Wis. 143, 264 N.W. 622, 624 (1936) defines an "appropriation bill" as "a measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount,

manner, and purpose of the various items of expenditure." (Emphasis added.)

See also Don Muyskens' article, Item Veto Amendment to Iowa Constitution, 18 Drake Law Review 245, 249 (May 1969) citing *Dammann*, supra, this note, *State v. State Bd. of Fin.*, 69 N.M. 430, 367 P.2d 225 (1961), and adding, "*and any other matters germane to the appropriation*," (E.A. citing *State ex rel. Teachers, Officers v. Holder*, 76 Miss. 158, 23 So. 643 (1898).

Also see annotation, 35 A.L.R. 600 (1925), supplemented in 99 A.L.R. 1277 (1935) and cases cited therein.

10. The Constitutions of 36 states authorize their Governor to disapprove (veto) "items" only in bills appropriating money; of these 29 permit veto of entire items only, while 7 permit reduction of items. See 18 Drake Law Rev.

The term "item" as applied in the case of "an appropriation bill" "is an indivisible sum of money dedicated to a state purpose", Black's Law Dictionary, Fifth Edition, quoting *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120, 124, 125, 127, 130, 131. While some jurisdictions, under their constitutional division of powers, may have been more liberal in ascribing authority to the Governor and in construing sections of general legislation as falling within the term, item, see *Henry v. Edwards*, La., 346 So.2d 153, 158 most hold explicitly or implicitly, that "item" as used in this context fundamentally concerns a provision appropriating money.

In the *Bengzon* case, supra, cited by respondents, the Supreme Court of the United States said the Supreme Court of Texas in *Fulmore v. Lane*, 104 Tex. 499, 512, 140 S.W. 405, clearly pointed out the distinction between the veto power in respect of a bill in the general sense and a bill making appropriations. Quoting the Texas Court with approval the U. S. Supreme Court said,

Nowhere in the [Texas] Constitution . . is the authority given the Governor to approve in part and disapprove in part a bill. The only additional authority to disapproving a bill in whole is that given to object to an item or items where a bill contains several items of appropriation. It follows conclusively that where the veto power is attempted to be exercised to object to a paragraph or portion of a bill other than an item or items, or to language qualifying an appropriation or directing the *method* of its uses, he exceeds the constitutional authority vested in him, and his objection to such paragraph, or portion of a bill, or language qualifying an appropriation, or directing the method if its use, becomes *noneffective*. (Emphasis added.) [11]

That language is considered particularly applicable here.

In *Carter v. Rathburn*, 85 Okl. 251, 209 P. 944, 946 (1922) this Court stated ". . . Sections 11 and 12, Art. VI, of the Constitution confer certain powers upon the Governor, known as the veto powers, and prescribed the manner of exercising such powers." Sections 11 and 12, quoted supra, along with Section 58 of Article V, are the only constitutional provisions that mention the Governor's power to approve or disapprove (veto) a bill presented to him. He can act only in the manner specified therein and can exercise only those powers granted to him thereby.[12] The power to veto gener-

---

245, 251 (May, 1969), *Item Veto Amendment to Iowa Constitution* by Don Muyskens; *Thirteenth Guam Legislature v. Bordallo, Gov.*, 430 F.Supp. 405, 415 (D.C.1977), aff'd., 588 F.2d 265 (9th Cir.).

The Supreme Court of Idaho recently had before it the precise problem with which we now are confronted. In *Cenarrusa v. Andrus*, 99 Idaho 404, 582 P.2d 1082, 1090, that Court said: "The Governor argues that nothing in the language of the section [of the Idaho Constitution authorizing the Governor, as in Oklahoma to "disapprove" "any item or items" of a "bill making appropriations of money embracing distinct items"] requires the item veto to be limited to *money* items. We think that upon close examination of the language it is clear that this proposition is incorrect. The phrase 'embracing distinct *items*' modifies the phrase 'appropriations of *money*.' Thus, the words 'any bill making appropriations of money embracing distinct items' clearly refers to *items of appropriation of money*. Obviously the word item can not be given different meanings within the same sentence. We hold that the language empowering the Governor to 'disapprove

of any item or items' of an appropriation bill means that he may disapprove only items of appropriation of money."

A detail or particular item with expressed amount and purpose is still "an item irrespective of the fact that it may be included within a larger, more general item." See *Green v. Rawls*, 122 So.2d 10, 11, 16, 20 (Fla.1960), in turn cited in *Welden v. Ray, Gov.*, 229 N.W.2d 706, 712–713 (Iowa 1975).

11. The holding of *Fulmore* was reaffirmed by the Supreme Court of Texas in the 1976 opinion in *Jessen Associates, Inc. v. Bullock*, 531 S.W.2d 593, 598 (1975), see part VII infra.

12. Art. VI, § 2 Oklahoma Constitution vests "The Supreme Executive power" in the Governor, but he has no common law powers. The office of "governor" is unknown to common law. *Royster v. Brock*, 258 Ky. 146, 79 S.W.2d 707; 38 C.J.S. 970, Governor, Note 83. The powers of the Governor are granted to him "by the people in the Constitution or by the Legislature in making laws under it . . . ." *State ex rel. A.G. v. Huston, J.*, 27 Okl. 606, 113 P.

al legislation was not granted our Governor. His purported veto of § 17 under guise of "item" seems ineffectual to me.

## III

In connection with one argument already discussed (that H.B. 1567 allegedly is not a general appropriation bill as contemplated in Art. V, Section 56), respondents further assert that the bill is an act of general legislative nature, with limited, incidental appropriative characteristics, as opposed to making it a general appropriation bill under Article V, § 56, merely constituting it a single-item appropriation such as that involved in the early case of *Regents of State University v. Trapp, State Auditor*, 28 Okl. 83, 113 P. 910 (1911).

Respondents say that as the opinion in *Trapp* held the attempted reduction by the Governor of "apportioned" amounts of a single-item appropriation amounted to a disapproval of the whole bill, so here we should hold the purported veto of Section 17 in this case was a valid disapproval of the

Section as a provision of general law contained in a general legislative act under Section 11 (which we already have declined to do) or as an "item" under Section 12 of Article VI (which likewise we have declined to do), or failing that, they argue that pursuant to the holding in *Trapp*, we should decide that the partial attempted veto of H.B. 1567 did not amount to an unqualified approval and that the whole bill failed to become a law.

The opinion of this Court in *Trapp* in effect held that under Art. VI, § 11 the bill there involved appropriated a single item; that it required approval to become a law; that the Governor, although purportedly approving it had attempted to reduce various sums purportedly "apportioned" by the Legislature out of the "single item appropriation" and thus had "specifically disapproved portions of it" and the bill did not become a law.[13] The case has been cited favorably by one court in an opinion to a similar effect [14] but has not been followed generally.[15]

190, 192 (Okl.1910). See also *Fitzpatrick v. McAlister*, 121 Okl. 123, 248 P. 569, 572 (1926). He possesses *only* such powers and duties as are vested in him by constitutional or statutory grant. *State ex rel. Charlton v. French*, 44 N.M. 169, 99 P.2d 715, 720 (1940).

**13.** *Trapp* was concerned with a bill consisting of two sections. Section One appropriated some $285,000.00 to the University for the biennium ending mid-year 1924. The second section of the bill "apportioned" the amount so appropriated in Section 1 to a couple of dozen or so purposes for each of the two years. This Court there gave the term "item" a strict interpretation and held that even the apportioning of a single-item appropriation into a separate "apportioned" amounts did not make them "distinct items" as contemplated by Section 12; that by Section 11 of Article VI, the Governor's veto of apportioned sums amounted to a disapproval of the one item sought to be appropriated and therefore was, in effect disapproval of the entire bill.

**14.** See *Opinion of The (Delaware) Justices*, 210 A.2d 852, 855 (Del.1965). There, the Governor approved thirteen sections of a general legislative bill but .vetoed the fourteenth and last section. The Court held the general legislative bill there involved, as in *Dammann*, (see note 9, supra) and *Trapp*, had not been approved.

**15.** This Court distinguished *Trapp* in *Peebly v. Childers*, 95 Okl. 40, 217 P. 1049, 1051, 1052, 1053 (1923). Muyskens (referred to in notes 9 and 10, supra) p. 251 refers to *Trapp* as being contra to the general practice that the courts which have "permitted" the Governor to veto an entire item or reduce the amount of an item absent specific grant of constitutional authority to do so, have so held on the theory that if the Legislature could join several appropriations together making one item, the purpose of the law could be defeated. The *Trapp* case was distinguished in *State ex rel. Jamison v. Forsyth*, 21 Wyo. 359, 133 P. 521, 531, 532 (1913).

In *People ex rel. v. Brady*, 277 Ill. 124, 115 N.E. 204 discussed in *Welden v. Ray, Governor*, Iowa, 229 N.W.2d 706, 714 (Iowa, 1975), the Illinois Court in effect said "to hold that the whole bill was one item would constitute a legislative evasion of the governor's authority to veto distinct items".

The Arizona Supreme Court in *Fairfield v. Foster*, 25 Ariz. 146, 157, 214 P. 319–323 (1923) rejected the recited reasoning in *Trapp* as giving the Legislature, as stated in *Commonwealth v. Barnett*, 199 Pa. 161, 48 A. 976, 55 L.R.A. 882, power to put "purpose, subject and amount inseparably together and calling them an 'item' " thereby coercing "the Governor to approve the whole or none", reviving "the old evil" "which this section [here, distinct item veto power] was intended to destroy."

I would not apply the reasoning of this Court in *Trapp* to the facts involved here for two reasons. First, the Act here under consideration beyond any doubt admittedly included many distinct items of appropriation. Even if *Trapp* stated the law it would not be applicable here. Moreover, the reasoning in *Trapp*, I believe was to restrictive on the lawful authority of the Governor to veto items in that it would require approval of legislative evasion of that authority. I would disaffirm and overrule the holding in *Regents v. Trapp* that the portions of the purported one-item appropriation for the biennium could not be treated by the Governor as individual items subject to separate consideration. See *Green v. Rawls*, footnote 10, supra.

## IV

Another assertion respondents make is that H.B. 1567 is a "hybrid" or "split" bill partaking in minor part of the nature of a bill appropriating money whose items are subject to the Governor's veto power under Section 12 of Article VI, Constitution, and partaking in major part of general legislative provisions and that Section 17 in particular is a provision of general legislation that was disapproved under Section 11 (or is

an "item" that was disapproved under Section 12, a subject already discussed). For us to approve such a bill, respondents say would permit the Legislature to nullify "the clear intent of Section 56 of Article V, and the clear intent of Sections 11 and 12 of Article VI, as expressed" in *Trapp*, supra, and in *Peebly v. Childers*, 95 Okl. 40, 217 P. 1049, 1051 (1923).

Respondents rely on *Peebly v. Childers* mainly for its holding the Governor may not reduce items. However, it is to be noted that respondents incidentally reiterated the substance of language employed in both the body and in the 5th paragraph of the syllabus of that case indicating the Governor need not sign the bill for the remaining items to be enacted.[16]

Respondents' reference to the 1923 opinion of this Court in *Peebly v. Childers* on the basis it held a Governor could not lawfully reduce the amount of respective items in appropriation bills "embracing distinct items" is of little avail to them. Section 17 did not, as I have stated, constitute such an item. The holding is inapposite as the principle there announced is not deemed to be dispositive of any issue involved in the present case,[17] as H.B. 1567 was approved.

*Trapp* was cited recently by the Supreme Court of Idaho for the statement that "an item veto provision applying to '[e]very bill passed by the Legislature making appropriations of money embracing distinct items' [applied] only to those bills where more than one item of appropriation was made". *Cenarrusa v. Andrus, Governor*, 99 Idaho 404, 582 P.2d 1082, 1089, 1090, 1091 (1978).

16. A quotation of the gist of pertinent portions of respondents' argument seems appropriate. They "submit that had the non-germane general legislative provisions of H.B. 1567 . . . been properly set out in a general legislative bill, without the inclusion of items of appropriation, there clearly would be no question that Section 11 of Article VI would be applicable; . . . Likewise, had only the appropriation provisions of H.B. 1567 been included in a separate appropriations bill, such provisions would be subject to the Governor's item veto power under Section 12 of Article VI, and any of such provisions not vetoed would become laws.

"In the present instance, however, the legislature chose to combine general legislative provisions with items of appropriation in H.B. 1567, and thereby created a 'hybrid' or 'split

bill' not contemplated by the Constitution. It is only logical that the general legislative provisions of H.B. 1567 be subject to [veto under] Section 11 of Article VI and that its appropriation provisions be subject to [veto under] Section 12 of Article VI. Otherwise, by using the device of a 'split bill', the Legislature could nullify the clear intent of Section 56 of Article V, and the clear intent of Sections 11 and 12 of Article VI, as expressed in the decisions in *Regents for State University v. Trapp*, 28 Okl. 83, 113 P. 910 (1911); and *Peebly v. Childers*, 95 Okl. 40, 217 P. 1049 (1923)."

17. This Court's opinion in *Peebly v. Childers* held the Governor's attempt to reduce a $700,000.00 item and a $720,000.00 item appropriated for teachers' pay at Oklahoma University for two respective fiscal years; being in each instance only one out of about 2 dozen items in the bill appropriating monies for such respective years, was beyond the powers granted him by § 12 of Art. VI and not a lawful exercise of his veto powers.

However, the Court, apparently in its effort to save the University's appropriation near the commencement of the school year further said

the Governor's such attempted reduction of the described items was ineffectual for any purpose because, under the Court's theory there expressed, the meaning of a portion of Section 12 of Article VI is that in the case of an appropriation bill "embracing distinct items duly passed by the Legislature", "no affirmative action on the part of the Governor is necessary to vitalize" it. The Governor had timely approved the bill involved in that case except for the valid deletion (veto) of certain items in toto and except for the invalid attempt to reduce other items which invalid attempt the Court disregarded. It upheld the approval otherwise of the bill there involved.

The language from *Peebly v. Childers* that no affirmative approval by the Governor was required to enact the appropriation of distinct items in a bill embracing such items not vetoed, was this Court's interpretation there of the language from the second sentence of Section 12, "[but] all items not disapproved shall have the force and effect of law according to the original provisions of the bill." The Court already had held in the case that the attempted reduction of the described items of appropriation was void. In accord, see our decisions in *Regents v. Trapp*, supra, (overruled herein in another aspect, but) holding 113 P. at pages 910 and 913 that by § 12 "power is conferred upon the Governor to approve some items of certain bills and disapprove others," and *Carter v. Rathburn*, 85 Okl. 251, 209 P. 944, 949, 950 (1922) 209 P. at p. 949 where this Court held one whole item from among numerous ones in a bill appropriating distinct items, disapproved by the Governor and not repassed by the Legislature (it having already adjourned) "was an invalid appropriation."

The Court was not required under the facts existing in *Peebly v. Childers* to interpret the language at all because the Governor had signed the bill as above stated. In our view, the language was surplusage and definitely constitutes obiter dictum.

The statement that no affirmative approval by the Governor of items not vetoed in the bill under consideration in that case was required, may or may not have been the correct interpretation to give the language of the Constitution in the setting in which it is found and may not be repeated when a proper case arises specifically requiring that the language be construed.

There are at least three cogent and strong reasons why a consideration of the meaning of such language of Section 12 (with which in *Peebly v. Childers* the Court in our view prematurely concerned and expressed itself), should include a simultaneous consideration of the pertinent provisions of Section 11. A proper interpretation in a case actually calling for construction of the subject language in the unlikely event one should arise, may well require that all bills appropriating money and embracing distinct items if not retained by the Governor five (5) or more days exclusive of Sundays

during a legislative session or repassed over his veto, by the requirements of Section 11 must be approved by the Governor in order for them to become law.

In such a case, the Court well may find the real meaning of the subject language of Section 12 to be "but upon approval by the Governor of the bill . . ." etc.

Sketchily and succinctly stated those reasons are: (1), application of the principle of pari materia since the bills relate generally to the same subject matter, see, e. g., *Fitzpatrick v. McAlister*, 121 Okl. 83, 248 P. 569, 572 (1926); (2), consideration of the clear and specific language of the two sections, including internal cross-references (see the Sections quoted supra in notes 5 and 6), indicating that possibly if not probably all bills including Section 12 bills appropriating distinct items, unless retained by him 5 or more days exclusive of Sundays, during a session, or repassed over his veto, had to bear the written approval of the Governor as to items not vetoed, in order to become law; (in construing constitutional provisions of law, all laws bearing on the same subject are to be considered and given effect, *Jessen Associates, Inc. v. Bullock*, 531 S.W.2d 593, 600 [Tex.]); (3), executive interpretation historically and inerrantly pursued insofar as our research has revealed in that apparently all the Governors since Statehood have considered it a duty to and have approved all bills appropriating money (items), not wholly vetoed, including those vetoed or attempted to be vetoed in part, see *League v. Town of Taloga*, 35 Okl. 277, 129 P. 702, 704, 705 (1913), *Atl. Ref. Co. v. Okla. Tax Comm.*, 360 P.2d 826, 827, 831, 832 (Okl.1961), *Fairfield v. Foster*, 25 Ariz. 146, 214 P. 319, 321 (1923).

Nor have we found a single appropriation bill enacted since Statehood which was not signed by the Governor and yet to which validity was sought to be ascribed.

Other courts and writers, relying on the language in *Peebly v. Childers* we have distinguished as being dictum inapplicable to the facts of that case, have classified Oklahoma as having a constitutional provision that allows items of a bill making appropriations of money embracing distinct items, not disapproved by the Governor to become a law without his approval. See *State ex rel. Jamison v. Forsyth, St. Aud.*, 21 Wyo. 359, 133 P. 521, 531 (1913) and *Mills v. Porter, Auditor, "The Veto Case"*, 69 Mont. 325, 222 P. 428, 432, 433 (1924).

See also Don Muyskens' article, *Item Veto Amendment To The Iowa Constitution*, 18 Drake Law Review 245, 247–248 (May 1969) for the statement, based on the dictum from *Peebly v. Childers*, classifying Oklahoma as a jurisdiction, "whose constitution requires the [G]overnor's affirmative disapproval (i.e., if he does nothing the bill becomes law), the attempted partial veto is ineffective and the bill as a whole becomes law."

We have found no decision of this Court that involved the point that has so held.

I already have stated (see Section I of this dissent, supra) that H.B. 1567 is primarily a bill making appropriations to Department. That appears to be an adequate answer to the argument. The bill is not in my view a "split bill" or "hybrid bill" as respondents have charged.

"The [power to] veto is distinctly a negative, not a creative power." *Mills v. Porter*, 69 Mont. 325, 222 P. 428, 430 (1924). *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 981 (1974). It may properly be exercised, only to cut out an item or items of appropriation in a bill embracing distinct items.

I believe H.B. 1567 is a single, unified bill appropriating some $34,000,000.00 to Department and that § 17 thereof merely enacted conditions pertinent, suitable general legislative qualifications, naturally and reasonably related to the expenditure of the funds therein appropriated.[18]

## V

A further argument respondents advance is that both the body and the title of H.B. 1567 encompass two subjects and that the bill is void as being in violation of Sections 56 and 57 of Article V, Oklahoma Constitution.[19, 20] Respondents assert that the first subject is "Department of Corrections" and the second is "Appropriations" and cite 2 Alabama cases, *Ballentyne v. Wickersham*, 75 Ala. 533 (1881) and *Builder's and Painter's Supply Co. v. Lucas*, 119 Ala. 202, 24 So. 416 (1898) in support. Quoting from Cooley, Const.Lim. § 176, they say it would be a

"manifest impropriety" for the court to choose "between the two, and [hold] the act valid as to one and void as to the other."

Respondents add that one reason they have failed to comply with Section 17, is that it is a non-appropriation section, and lacks a "logical or natural connection" when combined with the appropriation sections of H.B. 1567 and thereby goes beyond the one-subject limitation of the cited Sections 56 and 57.

The last sentence of Section 56 provides that "All other appropriation [than "the general appropriation bill"] shall be made by separate bills, each embracing but one subject." The first sentence of Section 57 in pertinent part provides that "Every act of the Legislature [with exceptions not applicable here] shall embrace but one subject, which shall be clearly expressed in its title . . . ."

A proviso at the conclusion of Section 57 reads as follows: "Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof."

I have concluded H.B. 1567 is not a general appropriation bill such as is contemplated by Section 56, supra, but is, as previously noted, a bill to fund Department's needs. To my way of thinking, the Legislature was authorized to take cognizance of the fact that the number of persons considered for parole by virtue of criteria recommended by the Department would have a direct effect

---

**18.** As said by the Supreme Court of Mississippi in *State ex rel. Teachers and Officers v. Holder*, 76 Miss. 158, 180, 181, 23 So. 643 (1898) as quoted in *Bengzon*, supra, "[I]f a single bill making one whole of its constituent parts, 'fitly joined together', and all necessary in legislative contemplation, may be dissevered by the [G]overnor and certain parts torn from their connection, may be approved, and thereby become law, while the other parts, unable to secure a two-thirds vote in both houses, will not become law, we shall have a condition of things never contemplated, and appalling in its possible consequences."

That case, quoted in *Regents v. Trapp*, supra, 113 P. at p. 913, further stated "To allow a single bill, entire, inseparable, relating to the

one thing, containing several provisions, all complementary of each other and constituting one whole, to be picked to pieces, and some of the pieces approved and other vetoed, is to divide the indivisible, to make one of several, to distort and pervert legislative action, and, by veto, make a two-thirds vote necessary to preserve what a majority passed allowable as to the entire bill, but inapplicable to a unit composed of divers complementary parts, the whole passed because of each."

**19.** The text of Art. V, § 56 is quoted in full in footnote 7, supra.

**20.** Likewise, the text of Art. V, § 57 is quoted in full in footnote 8, supra.

on the total number of inmates remaining incarcerated and therefore the financial needs of the Department. Requiring a reduction of the percentage of unexpired portion of a felon's sentence yet to be served would directly affect the assignable housing space available, and the amount of food, clothing, supervision, and other items and services required to be furnished and thus would affect the amount of money that the Legislature must appropriate to fund the maintenance and operation of our Corrections Department and facilities.

In the 1975 opinion of the Supreme Court of Texas, *Jessen Associates, Inc., v. Bullock,* 531 S.W.2d 593, 600, (further discussed hereinafter in Section VII), that Court was considering a "rider" to their general appropriation bill, which, under their Constitution differently from our general appropriation bills, may include general legislation. The Court there said, "Despite the apparent exception for general appropriation bills, . . they too must be limited to a single subject, which is the appropriation of funds to be paid from the State Treasury." "In determining whether a bill includes more than one subject, both the constitutional provision and the statute under consideration are to be liberally construed in favor of constitutionality."

Respondents' argument at this point to an extent necessarily overlaps some of those discussed earlier herein. What I already have said appears to adequately rebut the assertion that the body of H.B. 1567 contains statutory provisions pertaining to two subjects.

Based upon the foregoing treatment to this point of the several arguments advanced, I conclude the body of the bill does not violate the quoted pertinent language of the mentioned sections of Article V.

In connection with respondents' alternative argument that the title of H.B. 1567 encompasses two subjects, we note that the first clause of that title recites, "AN ACT RELATING TO THE DEPARTMENT OF CORRECTIONS AND MAKING APPROPRIATIONS THERETO . . ."[21] Respondents cite cases,[22] to the effect that the subject of an act must be expressed in its title, and as noted they assert neither the body nor title may lawfully encompass more than one subject.[23]

In *National Mut. Casualty Co. v. Briscoe,* 188 Okl. 440, 109 P.2d 1088 (1940), this Court in dealing with the one-subject requirement of §§ 56 and 57 quoted from *Griffin v. Thomas,* 86 Okl. 70, 206 P. 604 (1922) and said:

The term 'subject', as used in these provisions, is to be given a broad and extended meaning, so as to allow the Legislature full scope to include in one act all matters having a logical or natural connection. If all parts of an act relate directly or indirectly to the general sub-

---

21. The title of H.B. 1567 as printed in the 1978 volume of O.S.L. consisted of 36 lines of rather large, prominent type, containing 24 clauses separated by semi-colons, generally stating the act relates to the Corrections Department and makes appropriations thereto, states the purposes of the act, authorizes the appointment, duties and compensation of employees, limits number of full-time equivalent employees, designates sections of statutes amended, etc. and as to matters covered by Section 17, "provid[es] for the establishment of criteria for recommending inmates for consideration for probation and parole;" provides for numerous other things such as housing, use of matching funds, reports of expenditures, lapse dates, repeal of statutes, and codification of sections of the bill, and includes severability and emergency clauses.

22. See authorities cited by respondents, to-wit: *Ramsey v. Diamond,* 127 Okl. 72, 259 P. 849 (1927); *Perry v. Carter,* 173 Okl. 267, 48 P.2d 278 (1935); *Black v. Oklahoma Funding Bond Commission,* 193 Okl. 1, 140 P.2d 740 (1943).

23. See *Commonwealth v. Dodson,* 176 Va. 281, 11 S.E.2d 120, 131, 132 (1940) for good, further discussion of "one subject" rule and statement that "matters germane to the object, made manifest by its title, may be included [in an appropriation bill]. Those things are germane which are allied, relative or appropriate. Its construction must be liberal and, because of this, statutes are not to be declared unconstitutional unless that conclusion is inevitable . . . If the title be not misleading and if those things are done which are germane to it, that is enough . . . ." The title must "give notice of the general subject of the proposed legislation and the interests likely to be affected."

ject of the act, it is not open to the objection of plurality.

Also in the *Briscoe* case this Court said:

Considerable misunderstanding has arisen over use of the word 'germane', which does not appear in the section. The germaneness which is required is that the body of the act be germane to its title.

Referring to the matters covered in the title of § 17, see footnote 4, supra, one of its twenty-four clauses is, "PROVIDING FOR THE ESTABLISHMENT OF CRITERIA FOR RECOMMENDING INMATES FOR CONSIDERATION FOR PROBATION AND PAROLE, . . ." Upon comparison of the standards posed in respondents' cases, the title of H.B. 1567 amply meets the requirement that the subject of the bill be clearly expressed in its title. See footnotes 21 and 23, supra. It is both sufficiently comprehensive and yet detailed generally, and also specifically as relates to Section 17, to fully comply with the Section to which respondents allude. Too, the matter in § 17 is covered in its title and is germane to the appropriation (Art. V, § 57; *Briscoe,* supra).

I deem Section 17 to have a "logical or natural connection" to the one subject (funding for Department and related directions as to duties and operations) contained in House Bill 1567. I further believe my stated conclusions to be aligned with those earlier decisions cited above, concerning the definitive scope of the word "subject" as it appears in Sections 56 and 57, Art. V, Const. So I find § 17 falls within the one-subject rule of §§ 56 and 57, Article V, and in that respect is not in violation of either of such Sections.

## VI

Respondents argue that § 17 is an attempt to invade the province of the Governor's clemency powers and is therefore in violation of Article VI, § 10 Const.[24] I conclude as to that contention respondents likewise err.

In Oklahoma, the governmental powers are distributed among the three branches. Art. IV, § 1. "Except as provided in the Constitution", "the three departments of government, legislative, executive and judicial, are required to be separate and distinct, so that neither shall exercise the functions properly belonging to either of the others". *Peebly v. Childers,* 95 Okl. 40, 217 P. 1049, 1051 (1923).

The legislative authority of the State, subject to the reservation of powers of initiative and referendum to the people, is vested in the Legislature, Const. Art. V, § 1. That body may repeal any law or pass any measure not inconsistent with the Constitutions of the United States or of this State, Art. V, § 7.[25]

The Legislature enacts laws specifying what acts constitute crimes and prescribing the punishment for commission thereof. 21 O.S.1971, §§ 1 et seq. The courts and/or juries fix the punishment of those convicted of having committed them. 22 O.S.1971, §§ 911, 927. The county sheriffs and State Corrections Department officials with respect to convicted felons, carry out the terms of the judgments and sentences. 22

---

**24.** Art. VI, § 10 creates a Pardon and Parole Board; makes it their duty to investigate and study applications for clemency and make recommendations to the Governor "of all deemed worthy of clemency"; and provides that the *Governor* "shall have *the power to* grant, after conviction and after favorable recommendation by a majority vote of said Board, *commutations, pardons and paroles* for all offenses, except cases of impeachment, upon such conditions and with such restrictions and limitations *as he may deem proper, subject to such regulations as may be prescribed by law.*" (Emphasis added.) He must *communicate* to the Leg-

islature at each session a *detailed report of clemency granted.*

**25.** "[T]he sovereign legislature . . . represents the will of the people . . . in all matters not either expressly or by clear implication prohibited by the [Constitutional]." *Tate v. Logan,* 362 P.2d 670, 673 (Okl.1961); *Dixon v. Shaw,* 122 Okl. 211, 253 P. 500, 501, 50 A.L.R. 1232 (1927). *Graham v. Childers,* 114 Okl. 38, 241 P. 178 (1925). There is a presumption that an Act of the Legislature is constitutional. *Appl'n of O. T. A.,* 355 P.2d 1028, 1031 (Okl.1960); *Edwards v. Childers,* 102 Okl. 158, 228 P. 472, 477 (1924).

O.S.1971, §§ 979 and 980. The Governor, after favorable recommendation from the Pardon and Parole Board as to pardons and paroles exercises the clemency powers.

The Legislature under authority reserved to it may itself enact statute specifically providing for "good time" credits for "inmate(s) of a state correctional institution". 57 O.S.1979 Supp. §§ 138 et seq. Such statutes are constitutional.[26]

In *City of Sand Springs v. Dept. Public Welfare*, 608 P.2d 1139 (Okl.1980), we recently said "The Legislature may delegate to an administrative body the power to determine some fact or state of facts upon which the law makes its operation depend." See also 37 O.S.1971, § 514 and *ABC Bd. v. Burris*, 612 P.2d 257 (Okl.1980). Similarly, executive entities may lawfully delegate authority to sub-committees and commissions.[27]

In addition to the credits for good conduct, blood donations, training program participation, jail-time and unrevoked parole time served, on prisoners' time to be served which the Legislature itself has allowed by statute (57 O.S.1979 Supp. § 138, upheld in *Potter v. People*, 330 F.Supp. 1243 [D.C.Okl.1973], and 57 O.S.1971, § 350, see note 26 supra), the Legislature in several other instances besides § 17 has delegated considerable authority as relates to prisoners and paroles to both the Pardon and Parole Board and individual officials.[28]

We note particularly that in the latter portion of 57 O.S.1971, § 332.7, supra, the Legislature specifically delegated to the Pardon and Parole Officer the specific authority and duty, "with or without application being made, to cause an examination to be made at the penal institution where the person [who has served one-third of his or her sentence] is confined, and to make inquiry into the conduct and the record of the said person during his confinement in said penal institution." The section further provides that "and thereafter said Pardon and Parole Officer shall report to the Pardon and Parole Board his findings, which shall be considered as a basis for consideration of said person for recommendation to the Governor for parole."

The delegation of authority there granted is very similar to that made in Section 17 of H.B. 1567. However, it is more far-reaching in both nature and degree. There, the grant was to an individual, the Pardon and Parole Officer. He must have inquiry made, render a report and "his findings . . . shall be considered as a basis for consideration of said person for recommendation to the Governor for parole."

To the contrary, the grant of authority to and placement of duty on Board in Section 17 is merely to "establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board" in-

---

**26.** In the case of *Ex parte Williams*, 63 Okl.Cr. 395, 75 P.2d 904, 905 (1938); *Burns v. Page, Warden*, 446 P.2d 622, 623 (Okl.Cr.1968); See *Harkey v. Page*, 451 P.2d 25 (Okl.Cr.1969); *Habeas Corpus of Roberson*, 400 P.2d 459, 460, 461 (Okl.Cr.1965); *Pugh v. State*, 416 P.2d 637 (Okl.Cr.1966); *Simpson v. Page*, 416 P.2d 635 (Okl.Cr.1966) upholding 57 O.S.1979 Supp. § 138 and 57 O.S.1971, § 350; Doubt as to constitutionality of a statute will always be resolved in favor of its validity. See also *Shattuck v. Grider*, 493 P.2d 829, 830 (Okl.Cr.1972). See also *Williams v. Ciccone, Director, etc.*, 415 F.2d 331 (8th Cir. 1969), and *Ex parte Anderson*, 192 S.W.2d 280 (Tex.Cr.App.1946).

**27.** See *Carl v. Board of Regents*, 577 P.2d 912 (Okl.1978), delegation to faculty Admissions Committee of authority to select all students to be admitted to *O. U. Medical School and Sanders v. Benton and Board of Corrections*, 579 P.2d 816, 820, 821 (Okl.1978), delegation of authority to suggest location of treatment center.

**28.** Delegation of authority to Pardon and Parole Officer under act making prisoners "with or without application being made," "eligible for consideration for a parole" "upon completion of one-third ($\frac{1}{3}$) of [his, her] sentence (57 O.S.1971, § 332.7), upheld in *Petition of Leaser*, 89 Okl.Cr. 351, 207 P.2d 365 (1949), authorized Pardon and Parole Officer to investigate and report findings and Pardon and Parole Board to consider applications for parole prior to expiration of one-third of sentence. See also *Ex parte Custer*, 88 Okl.Cr. 154, 200 P.2d 781 (1948); and *Ex parte Custer*, 88 Okl.Cr. 161, 203 P.2d 889 (1949). See also delegation of authority to Director of Department to determine the eligibility of prisoners to work for "public [works] project(s)." (57 O.S.1979 Supp. § 217).

cluding "minimum percentage of a sentence to be served before recommendation," make the required head-count report and take notice of the legislatively-prescribed 5% reduction of minimum percentage of sentence to be served if applicable.

Whereas the quoted language of Section 332.7, supra, merely places before the Pardon and Parole Board the Pardon and Parole Officer's "findings" for their consideration, so Section 17 requires only that the Corrections Board "establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board". The Pardon and Parole Board may then give the criteria such attention as it desires, if any. At most it would appear that the Pardon and Parole Board need give such "criteria" and any inmates, if any, presented to the Pardon and Parole Board as meeting any such criteria, "consideration" only.

To be noticed in this connection is the fact that 57 O.S.1971, § 354 empowers the Pardon and Parole Board to study the prisoners' prison records, give them a hearing when minimum sentence is served or earlier and "make such recommendation to the Governor as, in its discretion, the public interest requires." In the next section, (57 O.S.1971, § 355), the Legislature delegated to the Pardon and Parole Board the authority to "make and promulgate such rules and regulations for the study, hearings, recommendations, and supervision of all discharged parolees as [are] necessary to carry out the intent of this act." The Court of Criminal Appeals not long since upheld the Pardon and Parole Board's rule-making authority.[29]

Parole is a matter of grace. *Chase v. Page*, 456 P.2d 590 (Okl.Cr.1969). "The Oklahoma statutory scheme" "does not establish a liberty interest." *Shirley v. Chest-*nut, 603 F.2d 805 (C.A. 10, 1979). The Pardon and Parole Board before the enactment of § 17, under Art. VI, § 10, § 332.7, supra, and its rules drawn pursuant to §§ 354 and 355, supra, approved in *Fields v. State*, see footnote 29, had already been granted the authority to cause its own study to be made and to make its own "recommendation to the Governor as in its [own] discretion public interest requires," even before the expiration of one third of an inmate's sentence. The "criteria" to be suggested to Pardon and Parole Board by Corrections Board "for recommending inmates to be considered for parole by the Pardon and Parole Board" can hardly be said to materially enlarge either the latter Board's prerogatives or duties much less reduce either those of it or the Governor, since they need receive from the Pardon and Parole Board only such "consideration" as their intrinsic worth appears to merit.

In this day of the operation of numerous phases of state government in compliance with Federal Court edict, the Legislature in the exercise of its broad prerogatives may well believe it important by the enactment of legislation, to add impetus to the prompt selection of those incarcerated felons thought more ready for consideration for clemency. I have mentioned (see Section V) the effect the reduction of the number of inmates being cared for would have on the funding the Legislature must provide to Board and Department. "Practical values or consequences are to be remembered." *Commonwealth v. Dodson, Clerk of House of Delegates*, 176 Va. 281, 11 S.E.2d 120, 134 (1940).

Despite the slight, if any, enlargement of Pardon and Parole Board's authority and certainly no material infringement thereof

---

**29.** In its recent opinion in the case of *Fields v. State*, 501 P.2d 1390, 1394, 1395 (Okl.Cr.1972) our Court of Criminal Appeals held that "the matter of sentencing and the statutes which govern same . . ." and "Statutory remedies for the so-called 'Texas Verdict' [1000 years there] are a matter within the purview of the Legislature;" that pursuant to the "Forgotten Man Act" (Sec. 332.7, supra) "every inmate must be considered for parole on or before the expiration of one-third of his maximum sentence *in such a manner as the Board may determine*;" (emphasis added) and that "pursuant to Title 57, Section 355," O.S.A., "it is the intent of the [Pardon and Parole] Board that any inmate serving forty-five years or more, including a life sentence, shall be considered for parole or clemency after serving fifteen years."

by its enactment of § 17, the Legislature in effect has said the Board, because of its continuous supervision of such inmates, as a possible aid to Pardon and Parole Board, is qualified to establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board and to make recommendations as to minimum percentage of sentences to be served before recommendation.

No suggestion is nor indeed could be made that the Governor has been granted the power to pass on the prerogative of the Legislature to delegate authority to Board to "establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board" including "minimum percentage of a sentence to be served before recommendation" other than that of veto previously discussed throughout this opinion. Such delegation has been made by § 17. The granting of such authority does not "restrict or interfere with [the Governor's] power," *Ex parte Williams*, see note 26, supra, any more than did the granting of "credits" by the Legislature.

Performance of Correction Board's duty under § 17, to establish criteria for recommending classes of inmates ready for consideration by Pardon and Parole Board, who in turn might or might not, in their sole discretion recommend to the Governor that clemency be granted, in my opinion is not the exercising of such measure of "meaningful decision-making authority", as to amount to an invasion of the Pardon and Parole Board's authority, let alone the Governor's. See *Sanders v. Benton*, note 27.

The grant of any authority involved, if any, in making the simple mathematical reduction of the percentage of an inmate's time remaining to be served by 5%, in the statutorily prescribed circumstances (over 3500 inmate population) in the event they may arise, could not possibly be an infringement of the Governor's authority. It is not even a delegation of, or an infringement upon the Legislature's authority for that body has already by statute fixed the conditions and the percentage of reduction, all within the Legislature's rightful constitutional law-making sphere. Should the inmate population exceed 3500 on any report-

ing date the duties of Board at most will be ministerial in nature only and will be merely to report that fact and announce that a 5% reduction of minimum time required to be served has come about.

If the recommendations to the ' Pardon and Parole Board are merely for such Board's consideration and without persuasive force other than the validity of their own intrinsic merits, it would appear they surely could have no greater effect on the decisional authority of the Chief Executive. The ultimate exercise of the power to grant a parole or pardon is for the Governor, "subject to such regulations as may be prescribed by law", Art. VI, § 10, "upon such conditions and such restrictions and limitations as he may deem proper, subject, however, to the regulations . . ." imposed by law (57 O.S. 1971, § 332). The Legislature enacts the laws. Art. IV, § 1.

I conclude that the Legislature has lawfully delegated the authority to Corrections Board and may lawfully require it to "establish criteria for recommending inmates to be considered for parole by the Pardon and Parole Board," ["including] minimum percentage of a sentence to be served before recommendation" and further directed that "the minimum percentage [of a sentence to be served] shall be reduced five percent (5%)" "if . . . the inmate population is greater [on a reporting date] that three thousand five hundred (3,500) . . . "

No infringement upon the Governor's constitutional prerogative to grant clemency has occurred, in my view.

### VII

We move to a consideration of the effect the purported veto of § 17 had on the enactment of that and all other sections of H.B. 1567. The query arises as to whether H.B. 1567 including its § 17, became a law despite such purported veto. Petitioner contends that the Governor's "attempt . . to" veto Section 17 was ineffectual and the entire bill became law upon his approving it. I agree.

This Court has previously, in the case of *Peebly v. Childers*, 95 Okl. 40, 217 P.2d 1049,

1051 (1923), supra, in effect held that an invalid attempt by the Governor to reduce two separate items contained in a bill "making appropriations of money embracing distinct items" "was an unauthorized and futile gesture and wholly ineffectual for any purpose."[30] The previous reference (in Section IV) to a statement in *Peebly v. Childers* as being dictum in no way detracts from the principle of law there announced and above reiterated.

The Supreme Court of North Dakota in *State v. Olson, Gov.*, 65 N.D. 561, 260 N.W. 586, 591 (1935) quoted the above-stated principle of law (Governor may not reduce an item of appropriation) from *Peebly v. Childers* with approval.

Miss Ada E. Beckman in her Temple Law Review article[31] states that Oklahoma is considered to be one of the "Other authorities" holding along with Virginia as expressed in *Commonwealth v. Dodson* "that an unconstitutional veto is no veto at all and at best is but an idle gesture; that the

items [partially] vetoed were in fact never stricken out and that an [otherwise] unequivocal and unconditional approval validates the bill as a whole."

That writer continues, to the effect it appears "to be clear that the invalid disapproval of a condition is a nullity, and the majority of the courts have found that the invalid veto does not destroy the item [condition] and that it remains in force."

The two important things about *Peebly v. Childers* are first, the correctness and validity of the rule of law proper, there announced and second, the result there reached, though based on dictum rather than the fact the Governor had actually approved the balance of the bill in writing.

All three branches of our State Government, apparently with but few exceptions, have recognized and followed that and other generally recognized principles of constitutional law, pertinent here.[32]

A majority of the jurisdictions with constitutional provisions similar to ours,

---

**30.** The Honorable W. A. Ledbetter, a member of the Constitutional Convention, stated as quoted in Intervenor's brief filed in this Court in *Peebly v. Childers* that the Governor "could veto any particular item in [a bill appropriating money items to State institutions but], he could neither increase the items nor reduce them."

This Court has held the Governor may not reduce individual items or amounts even if the Legislature authorizes it. *State ex rel. Crable v. Carter*, 187 Okl. 421, 103 P.2d 518 (1940).

**31.** See Miss Beckman's article, found in 31 Temple Law Quarterly 27, 33 (1957), quoted in *Thirteenth Guam Legislature v. Bordallo*, 430 F.Supp. 405 at 410, note 32, (D.C.1977) and in *Welden v. Ray*, 229 N.W.2d 706 at 712 (Iowa 1975).

**32.** The Legislature generally with but relatively few exceptions has attempted to enact legislation in accordance with the bedrock principles laid by the framers. A search through all the indices to, and many of the titles and bodies of the hundreds and thousands of bills appropriating funds enacted by the Legislature commencing with the first Session in 1907–1908, contained in the four dozen volumes of Session Laws of regular and extra-ordinary Sessions, demonstrates that the Legislature has refrained from insertion of forbidden matter in general appropriation bills and in the case of other bills appropriating money, has always broken the totals into items for their own purposes and at

the same time enabling the Governors to consider them separately.

In all such bills the Legislature has either tersely or in a more detailed fashion as deemed appropriate, stated the purposes and placed whatever conditions and qualifications on the proposed expenditures as appeared appropriate.

For instance by S.B. 24, O.S.L.1929, p. 57, the Legislature appropriated $500,000.00 for construction of the Historical Building, and in a section thereof provided for submission by the contractor of an appropriate, adequate surety bond and further provided that no member of the State Historical Society, which along with the State Board of Affairs, was to supervise and approve the construction, could "draw any compensation" from the project "except necessary and reasonable expenses."

As relates to general appropriation bills, the First Legislature, in S.B. 347, 1907–1908 S.L. p. 29, entitled, "An Act to Provide The Necessary Expenses of State Government and Making Appropriations Therefor From the State Treasury of Oklahoma" provided some $376,000.00 for the pay and expenses of thirteen named executive department officials, the Corporation Commission and the Supreme Court.

To be noted particularly, however, is the fact that H.B. 10, 1907–1908 S.L. 24, appropriated $100,000.00 for the per diem and expenses of the members of the first Legislature.

Other bills enacted during the same session supplemented the funds set aside for all those

presented with the problem appear to hold as this Court did in *Peebly v. Childers* (Governor may not reduce items of appropriation or veto conditions and qualifications on items; attempt to do so is ineffectual, and whole bill if otherwise approved becomes enacted into law).

As the Court in *Thirteenth Guam Legislature v. Bordallo, Governor*, 430 F.Supp. 405, 417 (D.C.1977), affirmed 588 F.2d 265 (9th Cir.) said, there is a "plethora of cases" so holding.[33]

Some other jurisdictions permit reduction of items under constitutional provisions otherwise similar to ours but nevertheless hold the Governor still may not veto a qualification of an appropriation and the bill upon being approved otherwise, becomes law.[34]

Other jurisdictions with constitutional or organic act sections providing that the Governor need only return to the Legislature either entire bills vetoed or items of appropriation disapproved (and his approval of other items is not required for enactment)

purposes and appropriated funds for other purposes.

Through the years the Legislature has often enacted "Departmental Bills" with titles indicating funds were, by the respective bills, being appropriated for the operation of the "Legislative, Executive and Judicial Departments" e. g., S.B. 107, O.S.L.1923, p. 60, S.B. 240, O.S.L. 1935, p. 359, and H.B. 14, O.S.L.1947, p. 631. However, the funds provided for operation of the Legislature apparently without exception were made available in separate bills.

From time to time the Legislature also has enacted "Institutional Bills" such as the one with which this Court was concerned in the *Peebly v. Childers* case.

The last time the Legislature enacted a semblance of a general appropriation bill was 1953. Commencing with the 1955 Session, all bills making appropriations of money apparently have been "separate bills, each embracing but one subject." (Art. V, §§ 56 and 57).

One bill, S.B. 715, O.S.L.1907–08, p. 264, authorized the transfer back to Oklahoma of convicts from the Lansing, Kansas, Penitentiary, created a Board to carry out provisions of the act, authorized it to "make and establish rules and regulations for the government, management and control of convicts," gave the Board the authority to work convicts on "public roads, buildings and works" and appropriated $500,000 for the described transfer.

The Chief Executives likewise generally have followed the mandates of the Constitution. In Intervener's, Board of Regents' brief filed in *Peebly v. Childers* 95 Okl. at page 55, 217 P. 1049 are listed 4, 10 and 7 bills where Governors Cruce, Williams and Robertson respectively are said to have followed the practice of vetoing items only. No contrary instance has come to our attention.

Similarly this Court, as recited by Intervener at page 56 of the same brief, citing *Carter v. Rathburn*, stated "all of our Governors have construed Section 12, Article 6, Constitution, as limiting their power to veto by disapproving by striking out entire items and that no one of the Governors has heretofore ever seriously con-

tended that power vested in the Governor to reduce an item." As argued by Senator Woods, amicus curiae, in *Peebly*, as a legislative officer, the Governor could no more reduce an item than could one branch of the Legislature without the concurrence of the other.

This Court until the present likewise has consistently followed the principle so announced in *Peebly v. Childers*. See *Regents v. Trapp*, 28 Okl. 83, 113 P. 910, 913 (1911); *League v. Town of Taloga*, 35 Okl. 277, 129 P. 702 (1913); *Carter v. Rathburn*, 85 Okl. 251, 209 P. 944 (1922); *State v. Carter*, 187 Okl. 421, 103 P.2d 518 (1940). As said in *State v. Moore*, 50 Neb. 88, 69 N.W. 373, 61 Am.St.Rep. 538, favorably quoted in *Edwards v. Childers*, 102 Okl. 158, 228 P. 472, 474 (1924), "The legislative, and not the executive, department of the state should say how much of the public funds should be expended for every purpose."

**33.** Six states whose decisions uphold the enactment of the whole bill despite unconstitutional attempts to reduce items and veto conditions are as follows: Arizona, *Fairfield v. Foster*, 25 Ariz. 146, 214 P. 319, 322, 323 (1923); See *Black and White Taxi-Cab Co. v. Standard Oil Co.*, 25 Ariz. 381, 281 P. 139, 147 (1923); Connecticut, see *Patterson v. Dempsey and State v. Thatcher*, 152 Conn. 431, 207 A.2d 739, 746, 747, 748, 749 (1965); Mo., see *State v. Bond*, 495 S.W.2d 385, 393 (Mo.1973) citing *In Re Opinion of the Justices*, 294 Mass. 616, 2 N.E.2d 789 (1936); New Mexico, see *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 982, 987 (1974); Texas, see *Fulmore v. Lane*, 104 Tex. 499, 512, 140 S.W. 405 (1911); and Virginia, see *Commonwealth v. Dodson*, 176 Va. 281, 311, 11 S.E. 120, 134 (1940).

**34.** Jurisdictions with cases so holding include Iowa, see *Welden v. Ray, Governor*, Iowa, 229 N.W.2d 706, 710, 711, 715 (1975) and Massachusetts, see *In Re Opinion of the (Mass.) Justices*, 294 Mass. 616, 2 N.E.2d 789, 791 (1936) and *Opinion of the (Mass.) Justices*, 349 Mass. 804, 212 N.E.2d 562 (1965).

the Governor still may not disapprove provisions of general legislation, i. e., as said in *Bordallo,* supra, "The decisions emphasizing that words, phrases, and conditions are not items of appropriation are legion . . ." Such attempted vetoes in such cases likewise are ineffectual and the legislation so attempted to be invalidly vetoed becomes law anyway.[35]

Cases from other jurisdictions hold the Governor may not lawfully veto a general legislative provision of a general legislative bill, or a bill appropriating items, qualifying an item of appropriation included in the bill unless he vetoes the item and the bill upon approval otherwise becomes law despite the purported veto.[36]

Several earlier cases held that where the Governor otherwise approved the bill making appropriations, and the constitution or organic act did not permit item veto, attempts to veto items would fail and the bills become law.[37]

Some cases from certain other jurisdictions which have constitutional provisions unlike our Sections 11 and 12 of Art. VI, allowing the Governor to veto provisions of general legislation in general legislation bills, definitely are distinguishable and are not persuasive to our consideration of the present case.[38]

Other cases holding that the veto of some items and the attempt to reduce others, as in *Mills v. Porter,* and the veto of provisions qualifying items of appropriations without veto of the particular items as in *State v. Holder,* under constitutional provisions differing from ours, were not effective and that therefore the bills were not approved are considered to be distinguishable and not persuasive here.[39] Likewise not deemed persuasive here are the holdings by another Supreme Court, pursuant to the constitutional provisions applicable in that jurisdiction, that the Governor's veto of a general legislative act is not an unqualified approval of a bill and it therefore fails of enactment.[40]

**35.** *Fergus v. Russell,* 270 Ill. 304, 110 N.E. 130, 133, 148, Ann.Cas.1916B, 1120 (1915); and *State v. Forsyth,* 21 Wyo. 359, 133 P. 521, 531, 532, 533 (1913); and *Thirteenth Guam Legislature v. Bordallo, Gov.,* 430 F.Supp. 405, 417, 418 (D.C.1977) aff'd on appeal, 588 F.2d 265 (9th C.C.A.1978).

See also the opinion of the Supreme Court of the United States in *Bengzon v. Secretary of Justice,* 299 U.S. 410, 414, 57 S.Ct. 252, 254, 81 L.Ed. 312, 314, 315 (1937) which held the grant of item-veto authority to the Governor General of the Philippine Islands as to appropriation bills, did not authorize him to veto § 7 (granting gratuities to retired justices of the peace), a non-appropriation section of a twelve-section general legislation bill providing for the retirement of certain officials and section 10 of which made the necessary appropriation to finance the stated purposes of the bill.

**36.** See *Cenarrusa v. Andrus,* 99 Idaho 404, 582 P.2d 1082, 1092 (1978); and *Welden v. Ray,* 229 N.W.2d 706 (Iowa 1975).

**37.** For cases so holding, see *Porter v. Hughes,* 4 Ariz. 1, 32 P. 165, 166 (1893); *Callaghan v. Boyce,* 17 Ariz. 433, 153 P. 773, 782 (1915), (criticized in *Fairfield v. Foster,* 25 Ariz. 146, 214 P. 319 [1923] on another, but not on this aspect of the case); and *Stong v. People,* 74 Colo. 283, 220 P. 999, 1003 (1923).

**38.** See *State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 264 N.W. 622 (1936) and the later case of *State ex rel. Kleczka v. Conta,* 82 Wis.2d 679, 264 N.W.2d 539, 552 (1978) which held that in that jurisdiction the Governor's power to veto is coextensive with the Legislature's power to enact laws initially, [so] a Governor's partial veto may, and usually will, change the policy of the law.

**39.** See The Veto Case, *Mills v. Porter,* 69 Mont. 325, 222 P. 428 (1924). See also the oft-quoted case of *State v. Holder,* 76 Miss. 158, 23 So. 643 (1898), said in *State ex rel. Kleczka v. Conta,* 82 Wis.2d 679, 264 N.W. 539, 554, note 4, (1978) to be sui generis. Our present determination that *State v. Holder* is not persuasive as to the aspect of our case under present consideration in no way detracts from our earlier favorable quotation from that opinion as concerns the unified and valid character of a properly drawn bill appropriating items of money which also impresses appropriate conditions and qualifications on the expenditure of the funds so appropriated, see note 18, supra.

**40.** See *Opinion of The (Delaware) Justices,* 8 Storey 475, 210 A.2d 852, 854, 855 (1965) (veto of general section of general legislative bill not otherwise approved, was not "unqualified approval," and bill failed of enactment). In 1973 the Delaware Court reconfirmed the above holding in *Opinion of The (Delaware) Justices,* 306 A.2d 720, 722 (Del.1973).

I consider the recent Texas case of *Jessen Associates, Inc. v. Bullock*, 531 S.W.2d 593, 598 (Tex.1975), referred to in footnotes 11 and 17, supra, to be practically "on all fours" and highly persuasive here. The holding there reaffirmed the law pronounced in *Fulmore v. Lane*, favorably quoted by the U. S. Supreme Court in *Bengzon*, both previously discussed in Section II, supra.[41]

In *Jessen*, the Texas Legislature had included in the subject general appropriation bill a provision that an appropriation contained in the bill and bearing the specific approval of the Legislature for "Additions and Alterations to Law School" need not be approved by the "College Coordinating Board" as some other items had to be, before the funds could be obligated and spent for construction or major repair. Relying on purported veto of legislative waiver of Board approval, although the balance of the bill insofar as in pertinent here was approved by the Governor, Mr. Bullock, Texas Comptroller, refused to approve Jessen's $2500.00 claim for payment and mandamus issued.

The Texas Court under constitutional provisions reading just like ours, there held the Governor could lawfully veto only either an item or the whole bill; that the "rider" waiving College Coordinating Board approval and giving the Legislature's specific approval to expenditure of funds for construction and repair at the Law School "was intended merely to direct the use of those funds by giving express legislative approval to the projects specified," was not "an item of appropriation," that the Governor's attempt to veto it exceeded "the power granted to him," "his actions therefore have no effect," and the whole bill became law.

The opinion of the Supreme Court of Connecticut in a recent case involving a fact situation strikingly similar in essential aspect to that involved in our present case, *Caldwell v. Meskill*, 164 Conn. 299, 320 A.2d 788, 793, 796 (1973) is most persuasive here. Section 4 of a bill there in suit appropriated an additional three million dollars to supplement funds already made available for assisting in operation of mass transportation facilities in Connecticut towns.

Section 2 of the bill provided that the Commissioner of Transportation, notwithstanding provision of one sub-section of a certain statute, "shall proceed in accordance with the provisions of" another subsection (granting the Commissioner several discretionary powers), "to ensure that motor carrier transportation facilities shall be operated in the manner required by the general welfare of the state."

The Court there held the Governor's attempt to veto the quoted and other similar provisions of Section 2 which imposed general duties on the commissioner related to the whole appropriation but, as here, not restricted to particular items, was void and ineffectual and that the whole bill became law.

Likewise, some pertinent aspects of the 1974 New Mexico case of *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 983–985, 987 (1974) closely parallel our present situation. The Supreme Court there said the following language, to-wit: "None of the above appropriation [$688,800 to State Personnel Board] shall be spent for promulgating or filing rules, policies or plans which have significant financial impact or would require significant future appropriations to maintain without prior specific legislative approval", which the Governor attempted to veto was not as respondents claimed, "an unconstitutional intrusion upon the executive rule making power" but rather, clearly was a "limitation . . . on the spending of funds from the appropriation for the promulgation or filing of rules" etc., "not the promulgation or filing thereof." That Court said, apropos here,

41. The bill involved in *Jessen* was a general appropriations bill but that is not a material distinction here because, while our Constitution forbids the inclusion in such a bill of general legislation setting salaries for positions not already created, etc. (§ 56, Art. V, quoted in note 7, supra), the Texas Constitution permits the inclusion of legislation other than items of appropriation if the bill does not embrace more than one subject.

"The Legislature, which has the power and is charged with the responsibility of appropriating State money, is certainly concerned with matters which would have a significant financial impact upon or require significant future appropriations of State funds, and may properly limit the expenditure of appropriated funds for uses which will have such impact or require such future appropriations". That veto failed and the matter attempted to be so vetoed became law upon the approval of the bill otherwise.

The Court in the same case likewise nullified an attempted veto of language of a prepositional phrase that "In categories wherein specifically authorized" that as applied to the appropriations under nine separately designated categories, "The department of finance and administration may approve budget increases in agencies in the category pursuant to" a designated statute. The Court held to permit the veto to stand would change the general provision applicable to the concerned appropriations in the General Appropriation bill (as distinguished from language effecting only items of appropriation), was void, ineffectual and became law, the bill having been otherwise approved.

As argued by petitioner, Section 12 of Art. VI makes no mention of "appropriation bill." Further, as said by relator, mention of enactment of items of appropriation does not exclude enactment of general, non-appropriation sections contained in the same bill if germane, i.e., embraced in the same subject.

We note that, outside of Sections 11 and 12 of Art. VI, the Constitution refers to "appropriations" only as being made in "the general appropriation bill" and "separate bills, each embracing but one subject" (Art. V, § 56). This fact was recognized as early as 1911 in *Regents v. Trapp*, supra, in both paragraph 1 of the syllabus and at page 913 of 113 P. Our attention has been drawn to no provision of law, either constitutional, statutory or court pronouncement that a bill "making appropriations of money embracing distinct items" which also "embraces but one subject" may not include general legislation germane to that one subject. To the contrary, while the provision relative to "the general appropriation bill" strictly forbids the inclusion of extraneous material, the provision for separate bills making appropriations appears to invite insertion of appropriate general legislation. The Legislature, the Governor and the Court have recognized this as a "fact of life" since statehood. As appears from references occurring throughout this dissent, the Courts of the various states generally recognize the inclusion of such qualifying provisions in such bills as appears to be needed and germane, to be valid.

In summary,[42] as stated by Miss Beckman in her article "The Item Veto Power of the Executive", 31 Temple L.Q. 27, 33 (1957), see note 31, this part, supra, it appears to be "clear that the invalid disapproval of a condition is a nullity, and the majority of the courts have found that the invalid veto does not destroy the item [condition] and that it

---

**42.** Parenthetical to our summarization, we observe: (1), that whether the Governor would have approved H.B. 1567 had he anticipated our present holding herein is not before us for determination. See *Regents v. Trapp*, 28 Okl. 83, 113 P. 910, 914 (1911); *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120, 134 (1940);

(2) that, as said by the Supreme Court of Wisconsin in *State ex rel. Martin, A.G. v. Heil, Gov.*, 242 Wis. 41, 7 N.W.2d 375, 380, 381 (1942) we should "seek to discover the true spirit and intent of the provisions examined," "give effect to plain and completely unambiguous language" and "to find and interpret [a] constitutional provision in its setting" according to its "real meaning and [the] substantial purpose of those who adopted it;" and

(3) that as stated by the Supreme Court of Idaho in *Cenarrusa v. Andrus, Gov.*, 99 Idaho 404, 582 P.2d 1082, 1091 (1978) that State has a constitutional provision (Article III, Section 16) "specifically designed to prevent the evil of omnibus bills embracing several subjects of general legislation in one bill or attaching special interest riders to popular and necessary legislation." That Court continued: "Since the Governor will not, in theory at least, be faced with bills combining good and bad legislation on different subjects, there can be no need of an item veto power as to acts of general legislation."

remains in force." As said in *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120, 124 (Va.1940) "unconstitutional vetoes did not invalidate the budget bill as a whole, [when it], . . ., has been unconditionally approved." In *Bengzon v. Secretary of Justice*, supra, the U. S. Supreme Court, quoting from the Texas case, *Fulmore v. Lane*, said a Governor's attempt to veto "language qualifying an appropriation, or directing the method of its use, becomes non-effective; . . ."

Similarly, the Supreme Court of New Mexico in *State ex rel. Sego v. State*, 86 N.M. 359, 524 P.2d 975, 982, 987 (1974), said, "The Governor may not distort, frustrate or defeat the legislative purpose by a veto of proper legislative conditions, restrictions, limitations or contingencies placed upon an appropriation and permit the appropriation to stand . . . [T]he attempted veto was invalid." * * * "The final matter to be considered in these proceedings is respondent's contention that 'a finding that the governor's veto authority has been unconstitutionally applied nullifies the Appropriation Bill [House Bill 300] as a whole.' Respondents cite no authority for this contention, and we are not impressed with their arguments in support thereof. An unconstitutional veto must be disregarded and the bill given the effect intended by the Legislature."

In the present case, the Governor's authority is not equal to that of the Legislature as in Wisconsin, see footnote 38. Instead, it extends only to vetoing either some objectionable item or the entire bill. In my view, H.B. 1567 as originally passed contained § 17 as a condition, qualification, restriction, the performance of which was required along with expenditure of the accompanying appropriation. To be borne in mind is the fact that the Legislature is not forbidden to enact such a provision if germane, and the Governor is not granted the authority to veto it.

To me, Section 17 was a lawful condition and qualification upon the several distinct items of appropriation to Department made in the bill. The unconditional approval otherwise by the Governor of H.B. 1567, despite what I conclude was an unauthorized, ineffectual and void attempt to veto § 17, pursuant to Section 12, Art. VI completed the enactment of the whole bill including § 17 into law.

I would concur in the assumption of original jurisdiction but would vote to issue writ of mandamus. I respectfully dissent.

